Robert L. PARISH et al.

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION et al.**

Civ. A. No. 18733.

United States District Court,
W. D. Louisiana,
Shreveport Division.

July 31, 1973.

John Gallagher, Gallagher & Gallagher, J. Peyton Moore, Shreveport, La., for plaintiffs.

Arthur R. Carmody, Jr., Wilkinson, Carmody & Peatross, Shreveport, La., George W. Gangwere, Jr., Swanson, Midgley, Eager, Gangwere & Thurlo, Kansas City, Mo., for defendants.

## RULING

DAWKINS, Chief Judge.

The original plaintiffs here are student basketball players at Centenary College, located in Shreveport, Louisiana. They have instituted this action requesting that a preliminary and permanent injunction be issued against the National Collegiate Athletic Association (NCAA) and its officials to prevent enforcement of a ruling made by them which in effect declares plaintiffs ineligible to compete in interscholastic athletic competition at Centenary College.

We granted a temporary restraining order and extended it once, as allowed by the Federal Rules of Civil Procedure.[1] The College team not having been invited to any post-season tournament, the order was allowed to expire and a date was set for hearing upon the merits of the application for a declaratory judgment and a preliminary injunction.

Thereafter, defendants filed motions to dismiss, based upon several grounds, which were denied by opinion rendered March 27, 1973, D.C., 361 F.Supp. 1214. Subsequently, a hearing on the declaratory and injunctive aspects of the case was held April 4 and 5, 1973.

At that hearing defendants, following presentation of plaintiffs' evidence, moved to dismiss for lack of a substantial federal question and for failure to prove irreparable injury. This motion was referred to the merits.

These student athletes had been recruited by Centenary College to play basketball on athletic scholarships. The primary plaintiff, Robert L. Parish, as later will be shown, probably was the most sought-after college basketball prospect in the nation at the end of his last high school year.

Plaintiffs, as noted, request declaratory and injunctive relief against defendant to prevent NCAA from applying the "1.600 Rule" against them and declaring them ineligible to play on the Centenary basketball team. They seek injunctive relief against NCAA from applying its January 9, 1973, resolution, as it applies to Centenary and them insofar as it required Centenary to find them ineligible to play. Specifically, they request that we declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that the NCAA 1.600 Rule, contained in Article 4–6–(b) of its by-laws, is unlawful and unconstitutional under the Fourteenth Amendment of the Federal Constitution, as it affects them; and that we enjoin defendants from applying the Rule as barring Centenary's intercollegiate teams, or any other teams with which plaintiffs may associate, and to permit the College and any of its other intercollegiate athletic teams to participate, with full eligibility, in NCAA championship and other post-season games in the future.

At the outset, we ordered Centenary to be made a party plaintiff, because we felt its interests directly were involved. Centenary is a private four-year college in Shreveport and participates in several intercollegiate sports, principally basketball.

At all times, Centenary was and is a member of NCAA, an unincorporated association of colleges, universities and other institutions of higher learning. It is composed of some 750 member institutions and publishes annually a manual which includes the constitution, by-laws,

1. Rule 65(b).

interpretations, executive regulations, recommended policies, enforcement procedures, committee membership, and other rules involving its members. Approximately one-half of its members are State institutions, including those in Louisiana. This Association sponsors virtually all regional and national collegiate athletic competitions, including national collegiate championship events, invitational and post-season meets and tournaments and certain televised collegiate games or contests.

One of the specifically promulgated goals of NCAA is to insure that college athletes are an integral part of the student body of the college or university they attend.[2] The by-law enacted to attain this objective was 4–6–(b)–(1), which is known as the 1.600 Rule.[3] This by-law was amended at the NCAA annual convention January 13, 1973, by changing its requirement that a student predict a 1.600 grade-point average before being declared by his college or university to be eligible to participate in intercollegiate athletics. This requirement was that a student need only graduate from high school with a minimum 2.00 grade-point average (on a 4.00 level) in order to be declared eligible to participate in athletics. The 1.600 Rule provided in pertinent part:

"A member institution shall not be eligible to enter a team or individual competitors in an NCAA sponsored meet, unless the institution in the conduct of all of its intercollegiate athletic programs: (1) limits . . . eligibility for participation in athletics or in organized athletic practice sessions during the first year in residence to student-athletes who have a predicted minimum grade point average of at least 1.600 (based on a minimum of 4.000) as determined by the Association's national prediction tables or Association-approved conference or institutional tables."

Under the prediction tables, a student athlete's grade-point is predicted on the basis of a formula utilizing either high school grades or rank in high school class and a score on the Scholastic Aptitude Test (SAT) or the American College Test (ACT). It is quite apparent that one must score sufficiently high enough on either test to meet the minimum requirement of the 1.600 Rule.

Article 6, Section 2, NCAA's Constitution, empowers its council to make "official interpretations" of the Constitution and By-Laws, which are binding upon the entire membership after publication and circulation. The official interpretation of the Rule is designated as Official Interpretation 418 (O.I. 418):

"A student athlete who practices or participates while ineligible under the provisions of By-Law 4–6–(b) shall be charged with the loss of one year of practice and varsity eligibility by his institution for each year gained improperly which shall be the next year the student is in attendance. . . ."

It was brought to our attention at the hearing that there are some members of NCAA who have chosen not to follow the 1.600 Rule, and still continue as members in good standing in that organization, notwithstanding that their athletic teams are banned from participating in NCAA sponsored events, including collegiate championships and post-season competition, and from appearing on any NCAA sponsored nationally televised events.

It should be noted here that Centenary chose to be governed by the 1.600 Rule. The decision to join the Association is a voluntary one made by individual schools, and upon joining, the institution agrees to honor, uphold, and live by the rules and regulations adopted by the Association for the common good. Although association is voluntary, it is realistic to assume that if an institution does not associate with NCAA, it would be all but impossible to field a competitive team in any major sport unless that institution joined a similar type association, such as the NAIA.

---

2. NCAA Constitution, Art. 2(a).

3. See, *infra*.

An extensive discussion of the facts pertaining to how Robert Parish or his co-plaintiffs were recruited, or Centenary's athletic department's knowledge and actions in recruiting these athletes is not necessary here. A short synopsis will suffice to put this case in proper perspective.

A conservative evaluation of the evidence presented by plaintiffs shows that most of it pertained to Parish and this suit probably would not have been brought had it not been for this man's particular prowess on the basketball court. Defendants' evidence is based almost entirely upon Parish's situation, and very little on those of his co-plaintiffs.

Parish, 7′ 1″ in height, denominated a "super-athlete," was recognized during his last high school year by national magazines, newspapers, and sports columnists as probably the number one or number two leading basketball prospect in the United States, in the manner of Wilt Chamberlain and Lew Alcindor. He was named to several All-American high school teams and chosen by the *Basketball News* as the number one high school graduate basketball player in the country. Of course, he was recruited, even courted, by almost every major college in the nation.

In order to fulfill the requirements of NCAA's 1.600 Rule, Parish took the ACT twice, his score being an 8. Regrettably, before achieving such prominence, he had been somewhat deprived, both educationally and economically; and probably began to aspire ambitiously toward a full higher education only after "the baskets began to swish." With this score, most colleges "backed off" because they felt Parish could not meet the 1.600 requirement.

Initially, and at all relevant times here, the 1.600 Rule, as construed by NCAA, allowed institutions of higher learning to establish their own academic standards and policy: the school could use the national tables, i. e., those which showed the testing averages of students throughout the country; or it could use any approved conference tables, such as those of the Southeastern Conference; or it could develop and use its own tables. Such conversion tables existed for both SAT and ACT tests. Until 1969, NCAA allowed conversion of the ACT scores to SAT scores, or the reverse, but such conversions were required to be converted by the approved NCAA conversion table. This was meant to prevent an institution from shopping around in order for an athlete to meet the requirements. April 28 and July 11, 1969, NCAA expressly prohibited use of any conversion tables, and all member institutions, including Centenary, were so advised in writing. The effective date of this Rule was May 1, 1970. Subsequently, it issued still another directive to its member institutions advising that conversion was prohibited.

With these facts before us, we now turn to the recruitment of Robert Parish by Centenary. NCAA, knowing that he was going to be a highly recruited prospect, had familiarized itself with Parish's high school record before the summer of 1972, well prior to his being signed to an athletic scholarship contract by Centenary. During June of 1972, NCAA received information that Centenary was going to sign Parish, and one of its representatives, Berst, called then Coach Wallace and asked him how Parish was going to predict a 1.600 score. Wallace replied that the school was going to convert the ACT test score to an SAT score, whereupon Berst informed him this was prohibited by the rules. Subsequently, NCAA advised Centenary through its coaching staff and its Director of Athletics (who has "resigned" since the controversy arose), orally and by written correspondence, that the College could not convert ACT scores to SAT scores. As "water runs from a duck's back," so did these warnings fall on deaf ears and failed to prevent Centenary's Athletic Department successfully from proceeding with its efforts to sign Parish upon a scholarship contract.

The College signed Parish August 17, 1972, to a four-year athletic scholarship. It is interesting to note that Centenary's athletic agents-in-charge informed Parish that this scholarship award was made " . . . in accordance with the provisions of the Constitution of the National Collegiate Athletic Association, pertaining to the principles of amateurism, sound economic standards, and financial aid to student athletes."

Subsequently, Centenary informed NCAA that in taking such action it had converted test scores of other athletes at the school, *i. e.,* the remaining plaintiffs in this action. It is worthy of note that, as stated, even by using the most favorable conversion table, as did Centenary, Parish still failed to predict 1.600. Ironically, he and all other plaintiffs have maintained a higher scholastic grade-point average throughout their respective *college careers than required by* the Rule.

Thereafter, NCAA found that at least one of the plaintiffs had participated in intercollegiate athletics while ineligible under the Rule, and Centenary, to this date, has not declared any of plaintiffs *ineligible to participate in its basketball* program, as directed.

Under procedures followed by NCAA, it is the school in question which is responsible for declaring individual athletes ineligible pursuant to NCAA's internal legislation. Technically, NCAA sanctions run only against the school, not the athlete; but it cannot seriously be disputed that, practically, such sanctions do directly affect the athlete, or that NCAA bears the continuing responsibility for enforcement of compliance with the Rule. Since sanctions must be imposed against the member institution which fails to declare an individual athlete ineligible in accordance with such legislation, NCAA has done so here.

As noted, Centenary has not declared the athletes ineligible, and before it may appeal administratively, it must do so, requesting restoration of eligibility for them, which, of course, may be either denied or granted.

Now, unfortunately, we have before us the single, *not so simple,* question of whether we should issue a preliminary injunction against defendants—a "Hobson's choice," which we do not relish at all, considering the empathy we hold for all of these competing interests: 1) the careers of these young athletes; 2) their present and future prospects; 3) the outstanding degree of culture contributed by the institution known as Centenary College, locally, regionally, and nationally, since well before the War Between the States; and finally, 4) the nationwide elevation of scholastic and athletic standards developed by NCAA *for so many years.*

> "It [injunctive relief] is an extraordinary remedy, and will not be granted except upon a clear showing of probable success *and* possible irreparable injury. . . . However, 'the burden [of showing probable success] is less when the balance of hardship tips decidedly toward the partie[s] requesting the temporary relief.'" Checker Motors Corporation v. Chrysler Corporation, 405 F.2d 319 (2d Cir., 1969).

■ Although we have found, in our earlier ruling, that NCAA's imposition of sanctions against Centenary, and the athletes here involved, is State action for constitutional and jurisdictional purposes, still plaintiffs' position does not raise a substantial federal question under 28 U.S.C. § 1343 and 42 U.S.C. § 1983, wherein Congress has granted federal district courts jurisdiction and authority to redress deprivations, under color of State law, custom, or usage, of a right or privilege secured by the Constitution or federal law. Recently, the Supreme Court, in San Antonio Independent School District v. Rodriguez, 411 U. S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), held that education was not a fundamental right, explicitly or implicitly, protected by the Constitution, requiring strict judicial scrutiny of the situa-

tion of the parties in any case such as this.[4] This language is particularly applicable and appropriate here when considered in light of an earlier decision, Mitchell v. Louisiana High School Athletic Association, 430 F.2d 1155 (5th Cir., 1970), where the Court determined that a high school athlete's argument was constitutionally insubstantial:

> "The contention that the LHSAA failed to give reasonable notice of the pertinent eligibility rules alleges a denial of due process, though both the court and the appellees denominate it an equal protection violation. For better or worse the due process clause of the fourteenth amendment does not insulate a citizen from every injury at the hands of the state. "Only those rights, privileges and immunities that are secured by the Constitution of the United States or some Act of Congress are within the protection of the federal courts. Rights, privileges and immunities not derived from the federal Constitution or secured thereby are left exclusively to the protection of the states.' The privilege of participating in interscholastic athletics must be deemed to fall in the latter category and outside the protection of due process.

> "A claimed denial of equal protection by state action does arise under the Constitution and would normally be within the district court's jurisdiction under 28 U.S.C. § 1343, unless unsubstantial or frivolous. . . . The classification made by the eligibility regulation is neither inherently sus-

pect nor an encroachment on a fundamental right. On the other hand, it is grounded in, and reasonably related to, a legitimate state interest.

> "The eligibility rules of LHSAA are designed to insure fair competition among its member schools and between individuals; and to minimize the hazard of having the usual high school athletes competing with older, more skilled players. . . . Whether or not LHSAA was absolutely correct in this judgment, the equal protection clause permits it to deal with the problem ' "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," . . . and [it] need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked.' Even if there is a serious gap in LHSAA's eligibility regulations, it does not raise to constitutional dimensions and carry with it the entire bulwark."

See also, Paschall v. Perdue, 320 F.Supp. 1274 (So.D.Fla., 1970).

We must apply the above reasoning by dismissing this action insofar as it concerns NCAA because of lack of a substantial constitutional question even though this fact situation has occurred at the college level.

■ Addressing the merits, even if this is a right or privilege protected by the Constitution, we hold that the 1.600 Rule withstands the denial of equal pro-

---

4. There an unsuccessful attack was made upon the ad valorem tax system used by Texas to support its public school system. A majority of the Court ruled, in pertinent part:

> "The lesson of these cases in addressing the question now before the Court is plain. It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus the key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal

significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution. . . .

> "Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected. . . ."

tection attack because it has a rational relationship to legitimate State (or national) purposes. Obviously, the challenged action by NCAA is not subject to strict judicial scrutiny. Therefore, we turn to the traditional standard of review which requires only that the NCAA's system be shown to bear some rational relationship to legitimate purposes. NCAA adopted the 1.600 Rule as a means of insuring that the athlete be an integral part of the student body and to maintain intercollegiate athletics as an integral part of the education program. Mr. Byars, of NCAA, summarized the need for these rules, as establishing a minimum standard which would prevent exploitation of athletes by the college or university, that is, setting up and agreeing to the prediction process by NCAA's members in order to prevent recruitment for athletic purposes alone of young men who had relatively poor chances of obtaining academic degrees; to encourage institutions with lower standards to elevate those standards to be more compatible with other institutions; and to discourage the unsound academic and economic practices of the past which had allowed indiscriminate granting of scholarships, resulting in too many athletes dropping out after their freshman or sophomore years. This rule was adopted to prevent abuses and at the time it was thought that this rule would solve the problem.

Notwithstanding, NCAA now has determined (since its action involving Centenary, Parish, and his teammates) that the rule was inadequate. This is based upon the fact that the 1.600 Rule was repealed and the 2.00 Rule was enacted in its stead. In Associated Students v. NCAA (May 25, 1973, Civil No. S–2754, E.D.Cal.), Judge McBride stated:

"Without deciding the question, it appears that this classification is reasonably related to the purposes of the 1.600 Rule."

However, he concluded that the 1.600 Rule, as interpreted by Official Interpretation 418 (O.I. 418) did not meet muster as to equal protection constitutional requirements. We agree that the 1.600 Rule's classification is reasonable, not arbitrary, and rests upon a ground having a fair and substantial relation to NCAA's object in enacting the legislation, so that all persons similarly circumstanced shall be treated alike, *i. e.*, the Rule bears a rational relationship to the legitimate purposes for which it was enacted. Although application of the Rule may produce seemingly unreasonable results in certain situations, this is not unusual for use of generalized rules frequently produces irrational results in isolated circumstances. Such results do not condemn those rules under traditional equal protection scrutiny. Here, NCAA has advanced one step at a time, addressing itself to the phase of the problem which then seems most acute to it. *Mitchell, supra.*

Plaintiffs also presented evidence to show that the SAT and ACT tests discriminated against all of them in some form. One (Parish) came from a minority group, one from a rural school, etc. This type of evidence was rejected as having no weight in Murray v. West Baton Rouge Parish School Board, 472 F.2d 438 (5th Cir., 1973):

"Plaintiffs have made a broad-based attack on the use of psychological testing at Port Allen Elementary School. The focus of the attack appears to be that the tests are being used to discriminate against the black students. There is absolutely no evidence that the testing is being used to foster segregation in the class rooms, . . . and despite conclusionary allegations to the contrary, there is no evidence whatsoever that the tests are being administered in a discriminatory manner. If, as plaintiffs claim, there are a few black students whose educational progress has been wrongly retarded because of this testing, it is most unfortunate. But as a federal court we cannot intervene absent some well-defined constitutional deprivation. There is no factual showing that the tests are culturally biased, discrimina-

torily conceived, or even that they had a discriminatory effect. That the tests might not be an educationally valid one for a few individual children does not, in and of itself, give rise to constitutional deprivation. On the record before us, we can find no *constitutional* fault with the testing in the Port Allen Elementary School."

We take judicial notice of the fact that, at the time in question, the particular tests involved here under NCAA's Rule 1.600 were administered throughout the nation; almost every college in the United States required a *score* from one test or the other for admission purposes. We, therefore, must reject plaintiffs' claim as to this issue. We also note that members of the black race have been perhaps the greatest beneficiaries of numerically disproportionate participation in intercollegiate athletics; and they have done so under the aegis of the 1.600 Rule.

In *Associated Students, supra,* the Court stated:

"However, our concern here is not with the 1.600 Rule *per se,* but rather with the 1.600 Rule as interpreted by Official Interpretation 418 (O.I. 418). It is this interpretation which creates a classification which does not conform to equal protection requirements. Under Official Interpretation 418, we are concerned with a new and different classification in which (1) students who fail to predict a 1.600 grade point average on the NCAA prediction tables, and (2) who practice for and/or compete in intercollegiate athletics during their first year in attendance at a NCAA member institution are (3) penalized with the loss of future eligibility to participate in intercollegiate athletics for a given period of time (in this case one year). Bearing in mind that the central purpose of the 1.600 Rule is to insure that the individual who participates in intercollegiate athletics is capable of succeeding academically at the college level, this new classification is overinclusive and not rationally related to the objective of the rule as required under the standards set forth in Reid v. Reid, *supra,* insofar as it declares ineligible not only those student athletes who fail to predict a minimum 1.600 grade point average and who have not yet completed their first year in college, and not only those student athletes who fail to achieve a minimum 1.600 grade point average for the first year in college, but additionally those student athletes who demonstrated by the conclusion of the first year that they have the ability to achieve academic success by *actually earning* at least a 1.600 grade point average. Once a student has an earned grade point average achieved over a reasonable period of time, then it is unreasonable, in light of the purposes of the rule, to impose sanctions against the student based on the fact that he failed to *predict* a certain grade point average. Instead, any sanctions imposed should be predicated on the *actual* grade point average attained by the student. As each of the individual plaintiffs in this action had earned at least a 1.600 grade point average at the end of his freshman year at CSUS, the 1.600 rule of the NCAA, as interpreted, is in violation of the equal protection clause and is therefore unconstitutional as far as it seeks to declare these student athletes ineligible for future intercollegiate participation based upon the fact that they (1) failed to predict a 1.600 grade point average prior to entrance to CSUS, and (2) practiced for and/or competed in intercollegiate athletics during their first year in attendance at CSUS. See Curtis v. NCAA, *supra.*"

With this conclusion, we respectfully but regretfully disagree. It is our considered view that the Court in the just-quoted decision overlooked the fact that one of the purposes of the official interpretation of the 1.600 Rule is to prevent schools from granting scholarships to those students who, after taking part in testing procedures, do not show a possi-

**1228**

bility of attaining a degree *before* entering college.

Under that decision, all member schools could recruit all those athletes whose entrance examinations did not predict successful graduation and then, if they did obtain a higher grade-point average than 1.600 after the first year in school, they would be entitled to participate in NCAA sponsored athletic events thenceforth. The Court's decision there effectively would prevent enforcement of the 1.600 Rule, which the Court already had determined to be rational in order to achieve NCAA's stated objective.

We cannot fathom how the official interpretation creates a classification which is in nonconformance with equal protection standards. In order to meet that objective, determination of eligibility must be made at the time of application and certification; to make it at a later date simply destroys the classification which the Court already had conceded to be reasonable. This decision in effect would allow colleges to recruit ineligible athletes and hope they will meet graduation prediction standards *after* their first year grades are in, thus becoming eligible for their entire collegiate athletic life. As stated, it is our considered opinion that NCAA's official interpretation of its 1.600 Rule does not create a classification which violates the equal protection requirements of the Constitution.

Moreover, it is apparent from this analysis that the plaintiffs will not be deprived of due process under the Constitution since in *Mitchell* the Fifth Circuit addressed this very issue by holding that the Constitution did not protect the right to participate in interscholastic athletic competition. Apart from this, there are the recent Supreme Court decisions of Board of Regents, etc. v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570. In Roth, beginning at page

569 of 408 U.S., page 2705 of 92 S.Ct. the Court held:

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When [protective] interests are implicated, the right to some kind of prior hearing is paramount. But the range of [the] interests protected [by the right of] procedural due process is not infinite.

\*      \*      \*      \*      \*      \*

". . . But, to determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake. . . . We must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property.

\*      \*      \*      \*      \*      \*

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms.

\*      \*      \*      \*      \*      \*

"Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead have a legitimate claim of entitlement to it. It is the purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather, they are created in the dimensions or defined by existing rules or understandings that stem from an inde-

pendent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

Here, as far as NCAA is concerned, none of the plaintiffs already have acquired a security interest in any specific benefits that can be defined as property interests. One of the plaintiffs (Parish) has an expectation, or—perhaps it is better to say—unless something happens, there is a substantial probability of his later attaining monetary rewards for his superior athletic abilities as a professional. But, as we later will develop, we do not visualize how, as a matter of law, restraint from participating in post-season games or championships, or in nationally televised games for Centenary College, will diminish his opportunity to gain monetary benefits of a significant order. As to the other plaintiffs' possibilities of professional employment, they are at best mere speculation. And the privilege to acquire through competition the ability perhaps to coach at a later date in no way can be considered property as defined by *Roth, supra.* We hold, therefore, that there has been no denial by NCAA of due process here.

■ Although plaintiffs did not urge any violation of their First Amendment rights to freedom of association, such was done in *Associated Students, supra,* but because of its disposition of the case, the District Court did not reach that question. It is our opinion here that the 1.600 Rule in no way deprives any plaintiff of his right to associate with any particular group, *i. e.,* the right to associate with those persons competing in interscholastic athletic events.

■ It is well established that a preliminary injunction is "an extraordinary remedy and will not be granted except upon a clear showing of probable success and possible irreparable injury." *Checker Motor Corporation, supra.* Applying these standards to this case, it is clear that there is no substantial probability that plaintiffs will be successful on the merits, and we feel there will be no irreparable injury to plaintiffs, notwithstanding the Court's conclusion in *Associated Students* wherein the Judge stated:

"The opportunity to participate in intercollegiate athletics is a fleeting one. A student can compete for a maximum of only four years and then his college athletic career is ended. During those four brief years, the athlete is afforded the opportunity to compete and work with others, to gain confidence in himself, and to mature emotionally and physically. Also, it cannot be overlooked that many college athletes lay the foundation for a rewarding professional athletic career during their four years of intercollegiate competition. In this day and age of professional sports, Olympic games, and the like, it cannot be denied that college athletics can be of the utmost importance to many student athletes."

■ From our disposition of this case, we do not feel that irreparable injury will occur to plaintiffs. Moreover, both requirements for issuance of the injunction must be met, and here the first—that of probable success in this action—definitely is lacking.

Accordingly, it is hereby ordered and adjudged that the motion for a preliminary injunction against NCAA, to prevent its application of the 1.600 Rule here, is denied.