Steve **JUSTICE**, David **Wood**, Ivan **Lesnik** and Craig **Vesling**, Plaintiffs,

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**, Defendant.

**No. 83–552 TUC ACM.**

United States District Court, D. Arizona.

Nov. 18, 1983.

**360**

Stompoly & Even, John G. Stompoly, John R. Even, David L. Horley, Tucson, Ariz., Evans, Kitchel & Jenckes, David F.

Gaona, James A. Craft, Phoenix, Ariz., for plaintiffs.

Fennemore, Craig, Von Ammon, Udall & Powers, Calvin H. Udall, Ruth V. McGregor, Phoenix, Ariz., Swanson, Midgley, Gangwere, Clark & Kitchin, George H. Gangwere, Kansas City, Mo., for defendant.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge [*].

The plaintiffs in this action, student-athlete players at the University of Arizona, request that a preliminary injunction be issued against the National Collegiate Athletic Association (NCAA) to prevent enforcement of NCAA sanctions which render the University of Arizona football team ineligible to participate in post-season competition in the 1983 and 1984 seasons or to make television appearances in the 1984 and 1985 seasons.[1]

The plaintiffs bring both constitutional and antitrust claims. The constitutional claims are brought pursuant to 42 U.S.C. § 1983, with jurisdiction invoked under 28 U.S.C. § 1343. The antitrust claim alleges violation of Section 1 of the Sherman Act, and jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1337 and Section 16 of the Clayton Act, 15 U.S.C. § 26.

The defendant filed a motion to dismiss, or in the alternative, a motion for summary judgment pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure, respectively. This Court held a hearing on the motions for preliminary relief and for dismissal or summary judgment on October 18, 1983. From the testimony presented

---

[*] Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

1. The penalty imposed on the University of Arizona provided that the television ban was to occur in the 1983 and 1984 seasons, but contained a caveat adjusting the television sanction to affect the 1984 and 1985 seasons if the university had already entered into a "binding commitment" to appear on a football telecast during the 1983 season. The caveat concerning non-interference with existing television contracts is in accordance with Section 7–(c) of the NCAA Enforcement Procedures, which provides that "the penalty [banning television appearances] shall specify that the institution may not enter into any contracts or agreements" for television appearances while on probation. Because the University of Arizona had entered into a contract for a television appearance during the 1983 season prior to the imposition of the sanctions, the television sanction was adjusted to apply to the 1984 and 1985 seasons.

and memoranda and exhibits received, the Court finds as follows:

## I. FACTS

The pertinent facts on this record are without significant dispute. The four plaintiffs in this action are members of the University of Arizona varsity football team. Plaintiff Lesnik is a senior undergraduate in his last year of eligibility. Plaintiff Wood is a junior undergraduate. Plaintiffs Vesling and Justice are sophomore undergraduates, although Justice is classified as a "freshman red shirt" for purposes of athletic eligibility. Plaintiffs Lesnik, Wood, and Vesling are members of the first-string football team. All four of the plaintiffs were awarded an athletic scholarship to play football at the University of Arizona and were recruited by the University prior to the imposition and announcement of the sanctions.

The NCAA is an unincorporated association that regulates a substantial part of the nation's intercollegiate athletics. It is composed of approximately 960 four-year colleges and universities located throughout the United States. Approximately fifty percent of its members are private institutions and fifty percent are funded by the federal or state governments. The policies of the NCAA are established by its member universities and colleges at annual conventions and are carried out by the NCAA Council. The Council is composed of 46 persons who are elected by the membership at the annual conventions. 1983–84 NCAA Manual, NCAA Constitution, Article 5, Section 1. The University of Arizona is a public institution and at all pertinent times has been a member of the NCAA.

The NCAA publishes annually a manual which contains the NCAA constitution, bylaws, executive regulations, enforcement procedures, recommended policies, and rules of order. The NCAA constitution states in Article 2, Section 2, that "[a] basic purpose of the Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between college athletics and professional sports." The constitution also sets forth certain principles for the conduct of intercollegiate athletics. The section entitled the "Principle of Amateurism and Student Participation" defines an amateur student-athlete as "one who engages in a particular sport for the educational, physical, mental and social benefits derived therefrom and to whom participation in that sport is an avocation." *Id.* at Article 3, Section 1. This section also provides that a student-athlete shall not be eligible for participation in an intercollegiate sport if the individual: "(1) Takes or has taken pay, or has accepted the promise of pay, in any form, for participation in that sport ...." *Id.* Section 3–1–(g) of the constitution details the types of practices that constitute "pay" for participation in intercollegiate athletics,[2] and the NCAA bylaws contain numerous provisions concerning recruitment of and financial aid to student athletes by member universities.

On May 17, 1983, the Committee on Infractions of the NCAA issued Confidential

---

**2.** Section 3–1–(g)–(6) of the NCAA constitution provides in pertinent part: "(g) The following practices shall constitute 'pay' for participation in intercollegiate athletics and are expressly prohibited: * * * * (6) Special arrangements designed for a student-athlete, his relatives or other friends with extra benefits not made available to members of the student body in general or their relatives or other friends. Special arrangements specifically prohibited include, but are not limited to: special discounts or payment arrangements on purchases; loans without interest; guarantees of bond; regular or periodic use of an automobile without (or at a reduced) charge; transportation to or from the site of a

summer job without (or at a reduced) charge. * * * *" Section 3–4–(a) of the NCAA constitution provides in pertinent part: "(a) Any student-athlete who receives financial assistance other than that administered by his institution shall not be eligible for intercollegiate competition, except as provided in Constitution 3–1–(b), and except where: * * * (2) Assistance is awarded solely on bases having no relationship to athlete ability[.]"

Section 3(1)(g)(5) defines another prohibited practice: "Payment of expenses of any student-athlete returning home to receive an award for his athletic accomplishments or for other personal purposes."

Report No. 183(107). The report contained the results of the NCAA's investigation of the University of Arizona's football program, and detailed numerous violations of the NCAA constitution and bylaws by the University during the years 1975 through 1979. The Committee on Infractions proposed that disciplinary action be imposed upon the University of Arizona, including loss to the University football program of its eligibility both to participate in post-season competition following the 1983 and 1984 seasons and to appear on television during the 1984 and 1985 seasons. Ineligibility for post-season competition and for television appearances are among the disciplinary measures which Section 7-(b) of the NCAA Enforcement Procedure Program allows the Infractions Committee or Council to impose against member institutions.[3] The Committee notified the University of its right to appeal any of the findings or penalties to the NCAA Council.[4] No appeal was taken.

The Infractions Committee's report documented numerous occasions on which staff members and representatives of the University football program—including the then head coach of the football team—provided compensation or extra benefits to student athletes who are either in the University's football program or being recruited for the program. Specifically, the football staff was found to have provided the student athletes with benefits such as free airline transportation between school and their homes, free lodging, and cash and bank loans for the athletes' car payments, rental payments, and personal use. The University of Arizona has at no time denied that these violations occurred. Neither do the plaintiffs in this action dispute the fact that the violations did occur.

In their complaint, the plaintiffs allege that the NCAA's imposition of the sanctions deprives them of their constitutionally protected rights: (a) to be free of punishment in the absence of guilt; (b) to partici-

3. Section 7-(b) of the NCAA Enforcement Procedure Program states in part:

(b) Among the disciplinary measures, singly or in combination, which may be adopted by the committee or Council and imposed against an institution are:

(1) Reprimand and censure;
(2) Probation for one year;
(3) Probation for more than one year;
(4) Ineligibility for one or more NCAA championship events;
(5) Ineligibility for invitational and post-season meets and tournaments;
(6) Ineligibility for any television programs subject to the Association's control or administration or any other television programs involving live coverage of the institution's intercollegiate athletic team or teams in the sport or sports in which the violations occurred;
(7) Ineligibility of the member or its personnel to serve on committees of the Association, or both;
(8) Prohibition against an intercollegiate sports team or teams participating against outside competition for a specified period;
(9) Prohibition against the recruitment of prospective student-athletes for a sport or sports for a specified period;
(10) A reduction in the number of either initial or total financial aid awards (as defined by 0.1.600) which may be awarded during a specified period;
(11) Requirement that an institution which has been represented in an NCAA champion-

ship by a student-athlete who was recruited or received improper benefits (which would not necessarily render the student-athlete ineligible) in violation of NCAA legislation shall return its share of net receipts from such competition in excess of the regular expense reimbursement, or if said funds have not been distributed, they shall be withheld by the NCAA executive director; or individual or team records and performances shall be vacated or stricken; or individual or team awards shall be returned to the Association, or any combination of the preceding penalties.
NCAA Manual: NCAA Enforcement Procedure Program, Section 7-(b)

4. The NCAA Enforcement Program regulations provide that a member university has 15 days from the time it receives the Infraction Committee's report to give the NCAA Council written notice of appeal of the Committee's findings, the proposed penalty, or both. *See* NCAA Enforcement Procedure, Section 5(b). The member university may submit a written appeal and be represented before the Council at the time the appeal is heard. The letter containing the Committee's findings stated that should the University of Arizona appeal either the findings or the proposed penalties, the Committee would submit an "expanded confidential report" to the Council that would include additional information in accordance with Section 6 of the Enforcement Program.

pate in intercollegiate athletic competition—including post-season bowl games—and receive the national exposure critical to securing a professional football contract; and (c) to pursue the vocation of their choice and to exercise their freedom of expression without prior restraints. The plaintiffs also allege that the sanctions by an association of colleges and universities in competition with the University of Arizona constitute a group boycott in violation of Section 1 of the Sherman Act.

The plaintiffs allege further that by precluding them from competing with other highly rated college football teams in post-season play and denying them the exposure necessary to compete for contracts and bonuses with professional football teams upon graduation, the sanctions will cause them immediate and irreparable harm if not corrected before post-season bowl game invitations are extended in November of 1983. The plaintiffs thus seek a preliminary injunction prohibiting the NCAA from implementing the sanctions.

## II. APPLICATION FOR PRELIMINARY INJUNCTION

 The traditional equitable criteria for granting preliminary injunctive relief are: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury to the plaintiff if the requested relief is not granted; (3) a balance of hardships favoring the plaintiff; and (4) advancement of the public interest (in certain cases). *See Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980); *Sierra Club v. Hathaway,* 579 F.2d 1162, 1167 (9th Cir.1978). In the Ninth Circuit, the moving party may meet its burden by demonstrating either: (1) a combination of probable success on the merits and the possibility of irreparable injury; *or* (2) that serious questions are raised and the balance of hardships tip sharply in favor of the moving party. These principles are not necessarily separate tests but rather are extremes of a single continuum. *Benda v. Grand Lodge of International Association of Machinists,* 584 F.2d 308, 315 (9th

Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). The critical element is the relative hardship to the parties. If the balance of harm tips decidedly toward the moving party, then he need not show as "robust a likelihood of success on the merits as when the balance tips less decidedly." *Id.* at 315; *Wilson v. Watt,* 703 F.2d 395, 399 (9th Cir.1983). The "irreducible minimum," however, is that the moving party demonstrate "a fair chance of success on the merits" or "questions … serious enough to require litigation." *Sports Form, Inc. v. United Press International, Inc.,* 686 F.2d 750, 753 (9th Cir.1982), *quoting Benda,* 584 F.2d at 315. Failure by the moving party to demonstrate any chance of success on the merits will not suffice, and makes a determination of potential injury or a balancing of hardships unnecessary. *See Sports Form, Inc.,* 686 F.2d at 753. The Court will now evaluate whether the plaintiffs have presented evidence sufficient to satisfy either prong of the Ninth Circuit test for preliminary injunctive relief, examining first whether the plaintiffs have demonstrated either "probable success" or that "serious questions" exist on the merits of their claims.

## A. POSSIBILITY OF SUCCESS ON THE MERITS

### 1. *The Merits—Right to Participate in Post-Season and Televised Football Games*

 The plaintiffs allege that their constitutional property interests have been denied without procedural due process of law. Plaintiffs bring their claim pursuant to 42 U.S.C. § 1983, under which state action must be shown in order for constitutional scrutiny to be applied. The federal courts, including the Ninth Circuit, have consistently held that the actions of the NCAA constitute "state action" for constitutional and jurisdictional purposes. *See, e.g., Shelton v. NCAA,* 539 F.2d 1197, 1198 (9th Cir.1976); *Howard University v. NCAA,* 510 F.2d 213 (D.C.Cir.1975); *Parish v. NCAA,* 506 F.2d 1028 (5th Cir.1975); *Associated Students, Inc. v. NCAA,* 493

F.2d 1251, 1254 (9th Cir.1974). This Court follows the rule set forth in the Ninth Circuit decisions in *Shelton* and *Associated Students,* and holds that the Due Process Clause of the Fourteenth Amendment applies fully to the actions of the NCAA. The Court likewise concludes that the plaintiffs' constitutional claims are sufficient to raise a substantial federal question so as to provide this Court with jurisdiction under 28 U.S.C. § 1343(3).[5]

Redress pursuant to § 1983 can be granted upon the showing of infringement of a property or liberty interest protected under the Fourteenth Amendment. The plaintiffs seek to establish by way of three separate arguments that a constitutionally protected property interest was infringed by the NCAA's imposition of the sanctions. Plaintiffs first contend that they possess constitutionally protected contractual property interests in playing in bowl games and appearing on television by virtue of their athletic scholarship agreements with the University of Arizona. The bounds of constitutionally protected property rights were advanced by the Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972):

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. *He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.*

*Id.* at 577, 92 S.Ct. at 2709 (emphasis added).

In *Roth* the court held that a college professor who had no tenure rights to reemployment after the first academic year did not have a property interest protected by the Fourteenth Amendment that was sufficient to require university authorities to provide him with a hearing when they declined to renew his contract. Noting that "the range of interests protected by procedural due process is not infinite," *id.* at 570, 92 S.Ct. at 2705, the Court explained the origin of such rights as follows:

> Property interests, of course, are not created by the Constitution. *Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law* —rules or understandings that secure certain benefits and that support claims or entitlement to those benefits.

*Id.* at 576–77, 92 S.Ct. at 2709 (emphasis added).

Both plaintiffs and defendant cite the *Roth* test in support of their arguments. The plaintiffs allege that they have a legitimate entitlement to participate in post-season bowl games and on television, by virtue of their scholarship "contracts" with the University. They claim that the "property interest" created by the contract includes oral representations made by University of Arizona officials during the recruitment process that enrollment at the University of Arizona as a student-athlete would allow them the opportunity to participate in televised and post-season games.

█ The defendant maintains that the opportunity to participate in televised and post-season bowl games is a "mere expectation" not entitled to due process protec-

---

**5.** The Court is aware that the Fifth and Tenth Circuits have held that an action alleging a violation of due process arising solely from an interference with a student's ability to participate in interscholastic or intercollegiate athletics fails to raise a substantial federal question sufficient to provide jurisdiction under 28 U.S.C. § 1343. *See Colorado Seminary (University of Denver) v. NCAA,* 570 F.2d 320, 322 (10th Cir. 1978); *Mitchell v. Louisiana High School Athletic Association,* 430 F.2d 1155, 1157–58 (5th Cir. 1970).

In addition to raising due process claims based on the plaintiffs' alleged right to partici-

pate in post-season or televised games, however, the plaintiffs also allege that the NCAA sanctions burden their Fourteenth Amendment right to be free from punishment absent personal guilt. It cannot be said that the latter claim is either "patently without merit," "obviously frivolous," or "clearly foreclosed by prior cases which have settled the question." *See Hagans v. Lavine,* 415 U.S. 528, 536–37, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974). Accordingly, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1343(3).

tion under *Roth*, and points out that the scholarship agreements contained no reference to such opportunities. Plaintiffs do not counter defendant's assertion that any oral representations made to the plaintiffs upon recruitment by football staff are outside the "contract." Under Arizona law, any evidence of prior discussions is precluded when an unambiguous and complete written contract is executed by the parties. *See Oberan v. Western Mach. Co.*, 65 Ariz. 103, 107, 174 P.2d 745, 747 (1946); *see also Isaak v. Massachusetts Indemnity Life Insurance Co.*, 127 Ariz. 581, 623 P.2d 11 (1981).[6]

Plaintiffs' citation of cases holding that a contract for a term of employment provides a protectable property interest under Arizona law is not helpful. The distinction between deprivation of employment expressly contracted for and the mere suggestion of the potential opportunity to play in a college post-season bowl game could not be clearer. The proposition that a college athlete's scholarship creates a protectable property interest in participation in college athletics, was rejected in *Colorado Seminary (University of Denver) v. NCAA*, 417 F.Supp. 885 (D.Colo.1976), *aff'd*, 570 F.2d 320 (10th Cir.1978). In *Colorado Seminary*, the court held that the "interest" in playing intercollegiate athletics which the college athletes contended was created by their scholarships was "too speculative to establish a constitutionally protected right," and commented that "the athlete on scholarship has no more 'right' to play than the athlete who 'walks on.'" *Id.* at 895 n. 5.

■ The plaintiffs in this case have been deprived neither of their scholarships nor their right to participate in intercollegiate athletics. Whatever oral representations that were made by university coaches to plaintiffs regarding participation in post-season and televised athletic contests created a mere expectation or desire rather than a legitimate claim of entitlement based on contract. *See Dixon v. Osman*, 22 Ariz. App. 430, 528 P.2d 181 (1974).

■ The plaintiffs' second argument is that they have a constitutionally protected right to participate in intercollegiate athletics—including televised and post-season bowl game competition—that has been infringed upon without due process of law. This Court is mindful of the Supreme Court's directive that in order for procedural due process guarantees to be invoked, there must be a denial of a right previously recognized and protected by state law. *See Paul v. Davis*, 424 U.S. 693, 711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Arizona courts have not determined that participation in intercollegiate competition in general or post-season contests in particular constitutes a protectable property right. In *Rutledge v. Arizona Board of Regents*, 660 F.2d 1345 (9th Cir.1981), *aff'd on other grounds sub nom. Kush v. Rutledge*, —— U.S. ——, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983), however, the Ninth Circuit held that an Arizona State University student on a football scholarship "enjoyed no right under the Constitution nor under the laws of

6. Even if the representations regarding the "opportunity" to participate in post-season competition had been written into the scholarship itself, it is doubtful whether the interest asserted would be substantial or concrete enough to invoke procedural due process protection. What is at issue here is not termination of employment, *see Hennessey v. NCAA*, 564 F.2d 1136, 1146 (5th Cir.1977), or revocation of the plaintiffs' scholarships, *see Rutledge v. Arizona Board of Regents*, 660 F.2d 1345, 1353 (9th Cir.1981), *aff'd on other grounds sub nom. Kush v. Rutledge*, —— U.S. ——, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983), or even participation in intercollegiate athletics, but rather the significantly less substantial and speculative opportunity to play in televised or post-season games. In addition, just as the representations contained an implicit assumption that they were conditioned upon the team's achievement of a record that warranted a bowl bid, they also must have implicitly been subject to the reasonable rule-making and regulatory authority of the sport's governing body, the NCAA. Under the plaintiff's theory, the NCAA would be prevented from taking any action inconsistent with a representation made by a member institution to an athlete on scholarship without first providing the individual athlete with procedural due process safeguards.

Arizona to maintain his position as either a first or second string defensive back or as the first string punter ...." *Id.* at 1352.[7] The court stated that the football coach's demotion of the athlete from a previously held first-string position did not constitute a deprivation of liberty or property, and that the athlete "had no legal guarantee" of uninterrupted enjoyment of the status he occupied during the previous year. *Id.* at 1352–53, *citing Paul v. Davis*, 424 U.S. at 701–12, 96 S.Ct. 1160–66 (1976). In support of its holding, the court cited several decisions from other circuits holding that participation in intercollegiate or interscholastic athletics is not a protectable liberty or property interest.

■ The plaintiffs have cited two federal cases which support the proposition that college athletes have a property interest in participating in intercollegiate athletics. *See Hall v. University of Minnesota*, 530 F.Supp. 104, 107–08 (D.Minn.1982); *Behagen v. Intercollegiate Conference of Faculty Representatives*, 346 F.Supp. 602, 604 (D.Minn.1972). The more persuasive authority, however, would lead this Court to conclude that participation in intercollegiate athletics is not a constitutionally protected interest. *See Colorado Seminary (University of Denver) v. NCAA*, 570 F.2d 320, 321 (10th Cir.1978); *Parish v. NCAA*, 506 F.2d 1028, 1034 (5th Cir.1975); *Williams v. Hamilton*, 497 F.Supp. 641, 645 (D.N.H.1980); *see also Walsh v. Louisiana High School Athletic Association*, 616 F.2d 152, 159–60 (5th Cir.1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (student's interest in participating in single year of interscholastic athletes amounts to a mere expectation rather than a constitutionally protected claim of entitlement); *Herbert v. Ventetuolo*, 638 F.2d 5, 6 (1st Cir.1981) (high school students suspended from ice hockey team had no property or liberty rights to play interscholastic sports and were not entitled to notice and hearing prior to suspension); *Denis J. O'Connell High School v. Virginia High School League*, 581 F.2d 81, 84 (4th Cir.1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *Hamilton v. Tennessee Secondary School Athletic Association*, 552 F.2d 681, 682 (6th Cir.1976).[8]

■ This Court need not address itself to the question whether the plaintiffs here have a protectable property interest in participation in intercollegiate athletics, however, for the sanctions imposed by the NCAA in this case deprived them of no such interest. The plaintiffs continue to

---

7. The plaintiffs cite *dicta* from *Rutledge* stating that plaintiff Rutledge "did enjoy a right against cancellation or 'gradation' of his scholarship 'during the period of the award' for athletic reasons and against revocation except for good cause, and only after a proper hearing, if so requested." *Id.* at 1353. They argue that the sanctions constitute a "gradation" of their scholarships and thus that they were deprived of constitutionally protected rights without procedural due process. This argument is inapposite for two reasons. First, the right described by the court in *Rutledge* arguably exists because of specific NCAA rules which refer only to gradation of a scholarship for "athletic reasons" (such as not performing well), not for disciplinary reasons. Second, the *Rutledge* court did not hold that the NCAA rules created such a property right, but rather merely stated that such a right existed for purposes of argument.

8. The plaintiffs concede that participation in interscholastic sports is not constitutionally protected, but argue that cases so holding are distinguishable because high school athletes are not recruited, given athletic scholarships, or af-

forded national exposure as are college athletics. These are distinctions of degree rather than kind; moreover, the plaintiffs offer no explanation of how these differences alter the underlying considerations that exist in an amateur, educational setting. In *Colorado Seminary v. NCAA*, the Tenth Circuit rejected the plaintiffs' attempt to raise this same distinction between college and high school athletes as follows:

> The fundamental positions are the same, the goals are the same, the stakes are pretty much the same. The same relationship also exists between the primary academic function of the schools in each category and the athletic programs. The differences in degree do not lead to a different result.

570 F.2d at 320.

The district court had stated in similar fashion: "We perceive no constitutional distinction between the loss of a forum for obtaining a contract for a college scholarship and a similar loss of a forum for obtaining a professional contract." 417 F.Supp. 885, 895 (D.Colo.1976).

participate in the University of Arizona's regular season competition. As noted previously, the question before this Court is rather whether there is a constitutional property right that protects post-season competition and television appearances. The plaintiffs have presented no authority for the proposition that their interests are protected by the Constitution. The NCAA cites *Parish v. NCAA*, 506 F.2d 1028 (5th Cir.1975), in which the Fifth Circuit specifically confronted the issue of participation in intercollegiate post-season play. In *Parish*, Centenary College granted basketball scholarships to students who did not meet the NCAA's minimum academic standards for first year eligibility in athletics. The NCAA applied sanctions preventing the school from playing in NCAA sponsored tournaments or televised games. Believing its basketball team to be of the caliber that would warrant a post-season tournament invitation, Centenary sought an injunction preventing the enforcement of the sanctions. The district court declined to grant the plaintiffs' motion for a preliminary injunction, citing both prior holdings in the Fifth Circuit that the Constitution did not protect the right to participate in interscholastic competition and the Supreme Court's restrictive definition of the liberty-property interest in *Roth*. The court stated that although one of the plaintiffs, Robert Parish, had a reasonable expectation of gaining a substantial professional contract at a later time, it did "not visualize how, as a matter of law, restraint from participating in post-season games or championships, or in nationally televised games for Centenary College, will diminish his opportunity to gain monetary benefits of a significant order." 361 F.Supp. 1220, 1229 (W.D.La. 1973). The district court stated further that the remainder of the plaintiffs' possibilities of professional employment were "at best mere speculation." *Id.* Concluding that the plaintiffs were not likely to suffer irreparable injury and that the plaintiffs' showing of probability of success on the merits "definitely is lacking," the district court denied the request for a preliminary injunction.

On appeal, the Fifth Circuit cited previous case law in the circuit holding that participation in interscholastic athletics fell outside the protection of due process, but stated that it "need not go that far" on the facts before it:

> For appellants here have lost only the opportunity to play in NCAA sponsored tournaments and televised games. Whatever the status of the alleged right to participate in interscholastic athletics, in the present circumstances we discern no "property" or "liberty" interest of which appellants have been deprived . . . .

506 F.2d at 1034 (emphasis added; footnote omitted).

The *Parish* court thus affirmed the district court's denial of a preliminary injunction, adding in a footnote that the NCAA sanctions had "caused no deprivation" with regard to the athletes' scholarships, which "remaine[d] in full effect." *Id.* at n. 17. *See Colorado Seminary (University of Denver) v. NCAA*, 417 F.Supp. 885, 896 (D.Colo.1976), *aff'd* 570 F.2d 320 (10th Cir. 1978) (members of university hockey team had "no constitutionally protected property or liberty interest in participation in intercollegiate athletics, post-season competition, or appearances on television"). This Court agrees with the Fifth Circuit's decision in *Parish*. Whatever property right might arguably exist with regard to participation in intercollegiate athletics, the plaintiffs here clearly have no constitutionally protected right to play in post-season competition or on television.

The plaintiffs' third theory in alleging deprivation of their due process rights is that they have a protected interest in receiving "the national exposure critical to obtaining a contract with a professional football team." This attempt to create a property interest is more attenuated than the first two. The same argument was dismissed by the *Parish* court in *dicta*:

> Appellants wisely abandoned at oral argument their attempt to create a property interest out of the alleged injury to their hoped-for careers in professional

basketball from the inability to gain tournament experience and television exposure. *Both the injury and the career are far too speculative to establish a property interest as defined in* ROTH. 506 F.2d at 1034 n. 17 (emphasis added).

■ In support of their claim that television exposure and post-season play are "critical" to obtaining a professional contract, the plaintiffs have submitted affidavits from professional football coaches who state that watching the performance of college athletes in televised contests can in some instances prompt them to select a particular player in the professional draft whom they would not otherwise have selected. *See, e.g.,* Affidavit of Bill Walsh, at pages 1–2. The head football coach of the University of Arizona testified in a deposition, however, that an individual television appearance would not "make or break" a player's professional career, and that other methods of evaluating a player—such as watching game films and observing players in person at practices—were probably more useful than watching a player's performance in a single post-season televised game. *See* Transcript of Deposition of Larry Smith, at page 72. While this Court does not deny that participation in post-season bowl competition or in televised games in some instances could have an impact on a player's initial salary in the professional ranks, it flatly rejects the assertion that the plaintiffs have a constitutionally protected interest in receiving television exposure in order to compete for professional contracts.

■ Because the plaintiffs' interests in participating in post-season competition or on television are not constitutionally protected, plaintiffs were not entitled to procedural due process safeguards prior to or upon imposition of the sanctions. Assuming, *arguendo,* that the plaintiffs did possess a protected property interest of some kind, the notice and opportunity for hearing given to the University of Arizona by the NCAA would have satisfied due process standards. The plaintiffs contend that notice and opportunity for hearing for them individually would be required at a minimum; however, these additional safeguards would not be constitutionally required or even appropriate under the circumstances in this case. It is well established that the procedural protection required by due process depends upon factors such as the private interest affected by the action, the risk of erroneous deprivation under the procedure provided, and the fiscal and administrative costs of adding additional safeguards. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In the instant case, the Infractions Committee of the NCAA provided the party upon which the sanction was imposed—the University—with notice of its preliminary findings and an opportunity to appeal to and participate in a hearing before the NCAA Council. Such notice to the head of the university or school attended by the students has been held to satisfy due process in cases in which student athletic participation has been suspended. *See Kelley v. Metropolitan County Board of Education of Nashville,* 293 F.Supp. 485 (M.D.Tenn.1968) (notice and opportunity for hearing to principal of school sufficient to satisfy due process; individual athletes not entitled to hearing). *Cf. Hennessey v. NCAA,* 564 F.2d 1136, 1146–47 (5th Cir.1977) (NCAA not required to provide notice and hearing to athletic coaches deprived of employment prior to enactment of bylaw limiting number of coaches at each member institution).

In addition, given the circumstances surrounding the sanctions imposed in this case, it is not clear that providing the additional safeguard of a hearing to the individual plaintiffs would serve any useful purpose. None of the plaintiffs were involved in the conduct which gave rise to the sanctions, nor do the plaintiffs dispute the findings of violations. Certainly the plaintiffs could attempt to show that the penalty is · too harsh and imposes hardships on them, but the Infractions Committee was undoubtedly aware of the consequences of such sanctions when it imposed them. Moreover, the Supreme Court's holding in *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723,

52 L.Ed.2d 172 (1977), establishes that when the factual basis for a disciplinary decision is undisputed and an individual wishes only to request leniency, an additional hearing is not required. *Id.* at 113–14, 97 S.Ct. at 1727–28. *See also Regents of University of Minnesota v. NCAA,* 560 F.2d 352, 371 n. 32 (8th Cir.1977) (factual predicate for penalty of ineligibility having been established, additional hearing would not have served to protect any substantive rights).

### 2. *The Merits—The Right to be Free From Punishment Absent Personal Guilt*

The plaintiffs assert that the imposition of the sanctions has infringed their fundamental right to be free from punishment absent personal guilt. It is undisputed that none of the plaintiffs or other current members of the University of Arizona football team or coaching staff was involved in the violations for which the sanctions were imposed. As support for the proposition that there is a substantive due process principle that protects individuals from punishment without "personal guilt," plaintiffs point to a number of statements by the United States Supreme Court which indicate that the government cannot impose legal burdens solely on the basis of a status or association of an individual. The phrase "personal guilt" is derived from a statement by Justice Harlan in *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), in which the Court upheld a conviction under the Smith Act for knowing and active membership in an organization advocating overthrow of the government. Justice Harlan stated:

> In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity ... that relationship must be sufficiently substantial to satisfy the concept of personal guilt in

order to withstand attack under the Due Process Clause of the Fifth Amendment. *Id.* at 224–25, 81 S.Ct. at 1483–84.

Significantly, the cases cited by the plaintiffs in support of their asserted fundamental right or liberty to be free from punishment absent guilt all involve criminal penalties, suspect classifications, or deprivations of constitutionally protectable liberty or property interests. *See, e.g., Robinson v. California,* 370 U.S. 660, 667, 82 S.Ct. 1417, 1420–21, 8 L.Ed.2d 758 (1962) (criminal penalty for mere status of narcotic addiction); *Weber v. Aetna Casualty and Surety Co.,* 406 U.S. 164, 175, 92 S.Ct. 1400, 1406, 31 L.Ed.2d 768 (1972) (denial of worker's compensation benefits to dependent illegitimate children); *Wieman v. Updegraff,* 344 U.S. 183, 191, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952) (loyalty oath required for employment covered innocent as well as knowing membership in subversive organization); *St. Ann v. Palisi,* 495 F.2d 423 (5th Cir.1974) (suspension of children from public school because of mother's conduct toward school officials).

The NCAA argues that the broad principle of freedom from punishment absent guilt is not applicable in the instant case because there has been no deprivation of an independent property or liberty interest that is protected by the Constitution. The plaintiffs cite *St. Ann v. Palisi,* 495 F.2d 423 (5th Cir.1974), in support of their contention that the right to be free from punishment absent personal guilt is in itself a protectable liberty sufficient to require the NCAA to demonstrate a compelling interest for the sanctions.

In *Palisi,* two school children whose mother struck an assistant principal were suspended from school under a regulation which allowed suspension of children for the misconduct of their parents. The mother brought an action individually and on behalf of her children, challenging the regulation as violative of the substantive due process guarantee of the Fourteenth Amendment. The Fifth Circuit held that predicating punishment upon personal guilt was one of the fundamental liberties not

enumerated in the Bill of Rights, and that in order to intrude upon this liberty the government must sustain a substantial burden of justification. The school officials in *Palisi* failed to meet this burden, and the court upheld the plaintiff's constitutional challenge of the regulation. Although the *Palisi* court appeared to rest its holding on the fact that freedom from punishment without guilt is "a cardinal notion of liberty," it made clear its belief that the school district did not have the power to arbitrarily deny the children the right to a public education. *See id.* at 427. Moreover, the court specifically stated that the lengthy suspension of the children from school constituted "punishment." *Id.*

■ The *Palisi* court's statement that the suspension constituted punishment is consistent with the Supreme Court's subsequent determination that a public education is a constitutionally protected property or liberty interest. *See Goss v. Lopez,* 419 U.S. 565, 577, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975). The NCAA contends that the instant case is distinguishable from *Palisi* and the other cases cited by plaintiffs in that no constitutionally protected interest has been infringed upon in this case. Indeed, examination of the case law indicates that courts have employed a fundamental right analysis, requiring the state to assert a compelling interest or substantial justification when punishment is not predicated on guilt, only when the "punishment" has constituted at a minimum a deprivation of a property or liberty interest. This Court

has already concluded that the right to participate in post-season or televised college athletic competition is not a constitutionally protected liberty or property interest. The fact that the plaintiffs are innocent of the wrongdoing that led to the imposition of the sanctions is truly unfortunate, but it does not *in itself* elevate the interest at stake to the level of a substantive constitutional right protected by the Due Process Clause of the Fourteenth Amendment.[9] *See Rose v. Nashua Board of Education,* 679 F.2d 279, 282 (1st Cir. 1982); *see also Burris v. Willis Independent School District,* 537 F.Supp. 801, 806–07 (S.D.Tex.1982).

Assuming that plaintiffs have some less than fundamental liberty interest in remaining free from punishment absent personal guilt, the Court must inquire only whether the NCAA's action was so irrational that it may be branded "arbitrary." *Kelley v. Johnson,* 425 U.S. 238, 248, 96 S.Ct. 1440, 1446, 47 L.Ed.2d 708 (1976). Sanctions which effectively punish innocent athletes for the conduct of others are not uncommon to the sports world. In *Moreland v. Western Pennsylvania Interscholastic Athletic League,* 572 F.2d 121 (3d Cir.1978), a high school basketball player claimed he was denied equal protection of the laws when his high school team was foreclosed from playing in post-season competition because it was under suspension for prior violations of league rules regulating class attendance and player eligibility. The Third Circuit rejected plaintiff's equal

---

**9.** *Palisi* is distinguishable from the instant case on two other grounds as well. First, *Palisi* involved the punishment of innocent children for the acts of their parent, a "classification" which gives rise to a stricter form of the traditional rational basis test. *See In Re Alien Children Education Litigation,* 501 F.Supp. 544, 573 (S.D. Tex.1980), *aff'd sub nom. Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (statute which prohibited use of state funds to educate persons who were not United States citizens punished children for acts of their parents and thus would be held invalid unless substantially related to permissible state interest).

Second, although the *Palisi* court applied strict scrutiny to the school regulation which suspended the children for the misconduct of

their parent, it stated that the regulation's constitutionality would be a matter of "serious concern" even if tested under the rational basis standard. The court noted that the regulation's subsequent repeal indicated that it was not "completely indispensable." The defendant in *Palisi* did not argue that the regulation served as a deterrent to parental misconduct, and the court noted that there were less restrictive alternatives such as prosecution of the parent under state law which would place restraint on the offending individual rather than on the innocent children. 495 F.2d at 428. The instant case does not involve the special "parent-child" relationship. The unavailability of less effective restrictive alternatives of the sanctions is discussed, *infra.*

protection claim, holding that the league rule that provided for suspension of a school for past violations was rationally related to the league's educational values. The court stated that the stigma attached to the school officials as a result of the sanctions served "as a meaningful deterrent to future violations," and added:

> It is regrettable, however that enforcement of the rule sanctioned upon schools for serious breaches of the rules visits tangible deleterious effects upon certain innocent players ....
>
> But the reality that the innocent do suffer because of the improper conduct of a guilty few is not an unusual occurrence in the sports world; it is an inherent risk in the rules of any game.

*Id.* at 126. *See Kelley v. Metropolitan County Board of Education of Nashville and Davidson County, Tennessee,* 293 F.Supp. 485 (M.D.Tenn.1968) ("group punishment" in form of one-year suspension of all high school's interscholastic athletic activity as a result of improper behavior by spectators at basketball tournament did not violate substantive due process, although a modicum of procedural due process was required).

In *Lewitus v. Colwell,* 479 F.Supp. 439 (D.Md.1979), a race horse owner alleged that he had been unconstitutionally denied a horse racing license by the Maryland Racing Commission. The regulation governing the issuance of licenses empowered the Commission to refuse to grant a license to applicants who were "consorting or associating with ... bookmakers, touts, or persons of similar pursuits ...." [10] Because the plaintiff had no "fundamental right" to possess an owner's license, the court merely inquired whether there was a "rational nexus" between the regulation's purpose—to insure the scrupulous conduct of racing—and the regulation's means of achieving that purpose. In upholding the Commission's denial of the license, the court rejected the plaintiff's contention that the due process clause required that punishment be predicated on personal guilt, and distinguished cases in which First Amendment freedoms had been involved. *See id.* at 447. The court stated that "[d]ue process is ultimately a task of balancing competing interests," and concluded that the plaintiff's interests in racing his horses and being free from punishment when he had done no wrong were outweighed by the state's interest in assuring that legalized gambling remain as far above suspicion as possible. *Id.*

The sanctions imposed by the NCAA in this case are not arbitrary or irrational. The protection and fostering of amateurism in intercollegiate athletics is a legitimate objective of the NCAA. The NCAA rules which provide for sanctions when member universities compensate athletes directly or indirectly for participation in intercollegiate competition are rationally related to the NCAA's stated objective of promoting amateurism. The sanctions imposed in this case were directed against specific misconduct by the University of Arizona. They serve to deter the University and other member institutions from engaging in similar misconduct in the future, and are meant to deny the University the benefits derived from its improper practices.[11] The plaintiffs' interests in partici-

---

10. Code of Maryland Regulations 09.10.01.25.B. The court found that the plaintiff had in fact been at least loosely associated with a person who had a record of illegal practices and had been barred from several racetracks. The court also found that the plaintiff's own record was "clean" and that the defendants never contested his assertions to that effect. 479 F.Supp. at 442.

11. The NCAA's contention that the sanctions deprive the University of the benefits gained through its misconduct, while theoretically sound, is somewhat questionable in this case, given the fact that the sanctions were imposed more than three years after the last violation was committed and affect a group of players and coaches entirely different from those who were involved in the misconduct. This lengthy delay, while inexplicable, does not remove the deterrent aspect of the sanctions or affect their constitutionality; for, as the NCAA notes, the sanctions are imposed on the University itself, not the players or coaches. Although a more expeditious imposition of sanctions would not ensure that the culpable individuals were disciplined or that innocent players would not be

pating in post-season and televised football contests and remaining free of punishment absent guilt must give way to the NCAA's broader interests in maintaining intercollegiate athletics as an integral part of the educational program and preserving the amateur nature of the college sport.

 This Court's authority is limited to making the determination above that the sanctions are not arbitrary or irrational; it is not its task to evaluate the relative efficacy of the particular means chosen by the NCAA to achieve its objectives. *See Shelton v. NCAA*, 539 F.2d 1197, 1198 (9th Cir.1976) (While the application of certain NCAA rules may produce unreasonable results in certain situations, "[i]t is not judicial business to tell a voluntary athletic association how best to formulate or enforce its rules"). Nonetheless, after examining the policies behind the sanctions imposed and the alternatives proposed by the plaintiffs, the Court is convinced that the NCAA's action in this case would probably meet a stricter constitutional test as well.

It is unfortunate and less than fair that the current football players are adversely affected by sanctions imposed for the misconduct of persons long departed; however, such a result is to some extent unavoidable under the present system. It takes a good deal of time for a full investigation to be conducted once potential violations are brought to the attention of the

NCAA Infractions Committee. Moreover, those individuals on the athletic staff who are culpable are likely to depart, either voluntarily or at the behest of the university, as it becomes clear that they will be implicated.

The fact that the NCAA can take action only against the member universities [12] and not the guilty individuals appears at first to undermine the effectiveness of the sanctions. Upon closer examination, however, it becomes clear that the rules providing for direct sanctions against member institutions provide the institutions with a strong incentive to police and prevent misconduct in their athletic programs.[13] Were the sanctions directed only at the players and staff members who were involved in the infractions rather than the university—one of the alternative sanctions suggested by plaintiffs—university officials would have little to lose and everything to gain by turning their backs on misconduct by athletic staff members, for overzealous coaches could be replaced as quickly as they are reprimanded by the NCAA.

The plaintiffs contend that there are less restrictive alternatives to the sanctions imposed by the NCAA. They suggest that the NCAA could have imposed a fine on the University of Arizona for its actions. The NCAA points out that imposing a fine is not among the options contained in Section

---

effected adversely, it could not help but make the sanctions seem less unfair to all concerned.

**12.** The NCAA does not take action against individual athletes but only against its member institutions. *See Regents of University of Minnesota v. NCAA*, 560 F.2d 352, 355 (8th Cir.1977); Article 2, Section 2(b) of the NCAA constitution provides:

(b) Legislation governing the conduct of intercollegiate athletic programs of member institutions shall apply to basic athletic issues such as admissions, financial aid, eligibility and recruiting; member institutions shall be obligated to apply and enforce this legislation, and the enforcement program of the Association shall be applied to an institution when it fails to fulfill this obligation.

NCAA Manual: NCAA Constitution Article II, Section 2(b).

**13.** In labeling the sanctions "irrational" and "overbroad," the plaintiffs fail to give any recog-

nition to the fact that the particular sanctions chosen by the Infractions Committee do have a substantial and direct deterrent effect on the university. In addition to depriving the university of substantial revenues from lost television contracts, the sanctions carry with them a stigma and loss of prestige in the academic community that are of no small event. *See Moreland v. Western Pennsylvania Interscholastic Athletic League*, 572 F.2d 121, 126 (3d Cir.1978) ("The sanction of suspending a successful team from post-season tournament competition visits powerful social and political pressure upon [school] officials.") Clearly, the sanctions serve as a meaningful deterrent to future misconduct by the University of Arizona and other universities with major football programs that are under increasing pressure from alumni, parents, fans, and the press to "win at any cost."

7 of NCAA Enforcement Program.[14] More importantly, the imposition of a fine, however large, would neither serve as a meaningful deterrent to future misconduct nor deny the culpable athletic program the benefits gained from its misconduct. Given the high priority placed on a successful athletic program at many large universities, it is doubtful whether monies used to pay fines would be taken out of the athletic department budget; rather, the price of the penalty would likely be paid by "innocent" third parties such as university contributors, taxpayers, or students and faculty in non-athletic departments of the university that would have otherwise been benefited by expenditure of general university funds.

Finally, plaintiffs suggested at the preliminary injunction hearing that the NCAA could deprive the University of scholarships for future years, rather than prohibiting student-athletes already enrolled from participating in post-season play. Such a sanction would be much more detrimental to a football program than are the present sanctions. For example, a university football program that could offer only half the number of scholarships awarded by its competitors for two consecutive years would be severely disadvantaged in its recruiting and performance for a period of four or five years. This sanction would "punish" not only the student-athletes who play on the less competitive team during those years, but also the students who would have been offered a scholarship to play football at the university but for the sanctions.

In sum, the rule that the plaintiffs would have this Court adopt as to the right to be free of punishment absent personal guilt is so broad that virtually any sanction or disciplinary rule, including the alternatives suggested by plaintiffs, would be struck down for "punishing" innocent persons. Indeed, under the plaintiffs' theory, the NCAA could not impose any sanction which adversely affected a football team unless every member of the team had violated NCAA rules. Clearly a distinction must be drawn between actions that constitute punishment without personal guilt for substantive due process purposes and actions which merely affect innocent persons adversely. This Court interprets prior case law as limiting the concept of "punishment" to deprivations of a fundamental right or liberty or property interest. This definition is consistent with the Court's discussion above of the practical problems that would accompany the broader interpretation of the concept suggested by the plaintiffs. Accordingly, the plaintiffs' loss of the opportunity to participate in post-season and televised competition, however unfortunate and personally undeserved, does not constitute a deprivation of their due process rights.

### 3. The Merits—Other Constitutional Claims

█ The plaintiffs allege two additional constitutional violations. First, they claim that the action of the NCAA has unconstitutionally interfered with their rights to pursue the vocation of their choosing. Second, they allege that the sanctions function as an unconstitutional prior restraint of their First Amendment right to freedom of expression.

The plaintiffs' first argument begins with the premise that they have a constitutionally protected right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference. They claim that their right to pursue future employment as professional football players in this case is based upon the "liberty" and "property" concepts of the constitutional due process clause.

This Court has already noted that the case law flatly rejects the notion that student-athletes' expectations of future athletic careers are constitutionally protected. See, e.g., Parish v. NCAA, 506 F.2d 1028,

---

**14.** For a list of the sanctions specifically authorized by the NCAA Enforcement Procedure Program, see note 3, *supra*.

**374**

1034 n. 17 (5th Cir.1975); *see also Colorado Seminary (University of Denver) v. NCAA,* 417 F.Supp. 885 (D.Colo.1976), *aff'd,* 570 F.2d 320 (10th Cir.1978). In *Kite v. Marshall,* 661 F.2d 1027 (5th Cir.1981), the Fifth Circuit held that a high school league regulation which rendered ineligible high school varsity athletes who attended a summer athletic training camp did not infringe upon a protected right to pursue a future athletic career. *Id.* at 1029. In *Colorado Seminary,* the court reached a similar result in the context of intercollegiate athletics. In response to the plaintiffs' argument that the college athletic forum is a vital training ground for professional athletic careers, the court stated that "the interest in such future professional careers must be considered speculative and not of constitutional dimensions." 417 F.Supp. at 895. This Court agrees.

■ The plaintiffs next contend that the NCAA's denial of television coverage of college football games or the playing and media coverage of post-season bowl competition constitutes a prior restraint upon the First Amendment freedom of expression. They base this argument on two theories. First, the plaintiffs claim that their own right to expression through entertainment is being unreasonably restrained. Second, they assert that college football is a popular form of entertainment to millions of citizens across the country and that the NCAA sanctions deny these audiences their right to entertainment.

In its most basic form, athletic competition does not constitute pure speech; rather, participation in athletic competition constitutes physical activity or conduct. In *Spence v. Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 2729, 41 L.Ed.2d 842 (1974), the Supreme Court recognized that certain "activity is sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," but stated that "we cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech'."

In following the distinction drawn by the Supreme Court in *Spence* between "conduct" and "speech," courts have generally been unwilling to deem athletic activity a protected First Amendment interest. *See, e.g., Post Newsweek Stations-Connecticut, v. Travelers Ins. Comp.,* 510 F.Supp. 81, 86 (D.Conn.1981); *Sunset Amusement Co. v. Bd. of Police Commissioners of City of L.A.,* 7 Cal.3d 64, 74, 101 Cal.Rptr. 768, 496 P.2d 840 (1972). Plaintiffs cite language from *Post Newsweek* that "exposition of an athletic exercise is on the periphery of protected speech (for the purposes of a balancing of conflicting interests), as opposed, for example, to political speech, which is the core of the First Amendment protection." 510 F.Supp. at 86. The plaintiffs in *Post Newsweek* sought to remove restrictions which denied them television coverage of the 1981 World Figure Skating Championships. The court was unwilling to extend the First Amendment's protection of free speech to cover athletic competition, however, and denied plaintiffs' motion for a preliminary injunction.

■ The central issue in determining the applicability of the First Amendment to "conduct" is whether the conduct at issue is sufficiently communicative. *See Spence v. Washington,* 418 U.S. at 409, 94 S.Ct. at 2729. Intercollegiate football, like other sports, is primarily a conduct-oriented activity; as such, it is not entitled to the same First Amendment protection that other more "communicative" forms of entertainment have been afforded. *See Facts Concerts, Inc. v. City of Newport,* 626 F.2d 1060 (1st Cir.1980) (First Amendment protects the production of jazz concerts); *Venuti v. Riordan,* 521 F.Supp. 1027 (D.Mass. 1981) (nude dancing and the playing of a harp protected by First Amendment). As such, plaintiffs' argument that the players have been denied a constitutional right to expression through football is unfounded.

Further, the plaintiffs' assertion that the NCAA sanctions deny the public at large its right to entertainment is also without merit. In *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 60, 96 S.Ct. 2440, 2427, 49 L.Ed.2d 310 (1976), the Supreme Court held that a litigant is not permitted

to assert the rights of third parties unless the regulation at issue constitutes a "real and substantial" deterrent to legitimate expression. This Court has already decided that there is no protectable, legitimate form of expression in playing college football. Moreover, the plaintiffs have failed to demonstrate how the NCAA sanctions constitute a "real and substantial" deterrent to freedom of expression.

Because there is no First Amendment interest at stake in this case, plaintiffs cannot allege that the NCAA sanctions amount to a prior restraint on their First Amendment rights. *See Choate v. United States*, 413 F.Supp. 475, 479–80 (N.D.Okl. 1976) (rejecting broadcaster's claim that an NCAA regulation prohibiting a member institution from appearing on television while on probation constituted a prior restraint). The NCAA's denial of plaintiffs' opportunity to appear in television or play in post-season bowl games does not constitute a prior restraint on plaintiffs' First Amendment rights.

### 4. *The Merits—Antitrust Claim*

The plaintiffs allege that the NCAA's imposition of the sanctions constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. The plaintiffs allege further that both the enactment of Section 7 of the Enforcement Procedure Program—which allows the Infractions Committee to impose sanctions—and the Infractions Committee vote were agreements among representatives of member institutions in competition with the University of Arizona to exclude it from the market for televised and post-season competition. As such, the plaintiffs contend, this "concerted action" constitutes an illegal group boycott which should be deemed a *per se* violation of Section 1 of the Sherman Act.

The defendant makes the following arguments in response: (a) the plaintiffs have not suffered an "antitrust injury" sufficient to entitle them to equitable relief under the antitrust laws; (b) because the sanctions do not affect "trade" or "com-

merce," the Sherman Act is not applicable; (c) the NCAA procedure, assuming it constitutes a boycott, does not have an anticompetitive purpose but rather promotes the salutary goals of a private sports association; thus, it is properly treated under the rule of reason; and (d) the sanctions are a reasonable restraint under the rule of reason.

#### a. *Standing*

Section 1 of the Sherman Act prohibits "every contract, combination ... or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. The Clayton Act provides standing to sue for both treble damages under section 4, 15 U.S.C. § 15, and for injunctive relief under section 16, 15 U.S.C. § 26 for violations of the Sherman Act. The plaintiffs here seek only injunctive relief. Section 16 of the Clayton Act provides in pertinent part:

> "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings ...."

15 U.S.C. § 26.

Under section 16, the plaintiffs are not required to show an injury to their "business or property" as they would be in an action for treble damages under section 4. *See In re Multidistrict Air Pollution M.D.L. No. 31*, 481 F.2d 122 (9th Cir.1973), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). Instead, in order to have standing under section 16, the plaintiffs must show: "(1) a threatened loss or injury cognizable in equity (2) proximately resulting from the alleged antitrust violations." *City of Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).

The threatened injury alleged by the plaintiffs in their complaint is the loss of potential professional contracts or bonuses that would result from the plaintiffs' participation in post-season or televised football games. The defendant argues that such an injury is so speculative that it fails to meet even the lower threshold standing requirement of section 16, and points out that the plaintiffs' threatened injury is based on the occurrence of the following contingencies: (1) that the University of Arizona will compile a good record despite the "vagaries and upsets inherent in college football"; (2) that bowl game committees will select the University of Arizona based on its record; (3) that the plaintiffs will continue to play for the team, avoiding injury or displacement by other athletes; (4) that the plaintiffs will play well in post-season competition or on television; (5) that the plaintiffs' post-season performance will cause professional scouts to notice talent that they would have otherwise overlooked; and (6) that plaintiffs will be drafted and sign contracts with professional teams based at least in part on their post-season or televised performance.

The plaintiffs have completely ignored the defendant's contention that the alleged injury is too speculative to provide plaintiffs with standing under section 16. They set forth no discussion or authority to support their conclusory allegation that their "injury" is cognizable in equity; virtually their entire standing argument consists of quotations which distinguish between the standing requirements of section 4 and section 16.

 This Court is well aware that a plaintiff need only show threatened rather than actual injury under section 16, but it does not share plaintiffs' apparent belief that section 16 provides standing for any threatened injury, no matter how insignificant the threat or attenuated the causal nexus between the alleged injury and violation. Under section 16, a plaintiff must demonstrate a significant threat of injury from a violation of antitrust laws likely to continue or recur, *see Zenith Radio v. Ha-*

*zeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969), and that it is "reasonably likely" that the contingencies upon which the injury is dependent will occur. *See Los Angeles Memorial Coliseum Commission v. National Football League,* 468 F.Supp. 154, 159 (C.D.Cal.1979). Although it is likely or even certain that the plaintiffs will not be able to play in a bowl game in 1983 if the sanctions remain intact, it is a much different and more speculative proposition whether the plaintiffs will lose professional bonus contracts. *See Parish v. NCAA,* 361 F.Supp. 1220, 1229 (W.D.La.1973), *aff'd,* 506 F.2d 1028 (5th Cir.1975). In addition to having the opportunity to participate in the University of Arizona football team's entire regular season schedule, the plaintiffs have also had the opportunity by virtue of the postponement of the television sanction to play in games in which the University of Arizona football team has been featured on regional television. The speculative nature of the threatened injury alleged by the plaintiffs in this case stands in direct contrast to the positions of the athletes in two cases cited by the plaintiffs in their argument on the merits of the antitrust claim. *See Linseman v. World Hockey Association,* 439 F.Supp. 1315 (D.Conn.1977) and *Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049 (C.D.Cal.1971). In *Linseman* and *Denver Rockets,* the plaintiff had already signed a professional contract, but the league bylaws of a professional association rendered him ineligible to play because of his age or college status. The plaintiff in each of those cases had clearly suffered an injury in terms of the loss of salary and impeded career advancement that was not speculative; there was no question as to the athlete's ability or readiness to obtain a professional contract.

The plaintiffs have also failed to address the second requirement of the standing test under section 16, which provides that proximate cause must be shown between the antitrust violation and the threatened injury. This part of the test is closely related to the inquiry whether the injury is too speculative to be cognizable in equity, and

involves an assessment of some of the "contingencies" mentioned above. The proximate cause inquiry has been employed by courts to ensure that the court's injunctive relief, if granted, would actually prevent the injury from occurring. In *Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir.1979), the City of Rohnert Park sought to enjoin the City of Santa Rosa and the Department of Housing and Urban Development from developing a regional shopping center on the grounds that they conspired to monopolize retail merchandise space in the regional area. The plaintiff had itself designated nearby areas as a commercial zone, and the facilities proposed for the zone included a regional shopping center. The plaintiff alleged that if a regional shopping center were constructed in Santa Rosa, this would discourage the development of a similar shopping center in Rohnert Park. The Ninth Circuit rejected the plaintiff's claim that the development threatened injury cognizable in equity under *In Re Multidistrict*, 481 F.2d at 130–31, stating that it was not clear from the record whether the plaintiff's commercially zoned land would be available for commercial use or whether its value would be affected by the location of the Santa Rosa center. As to the proximate cause requirement, the court stated similarly: "Rohnert Park has not made a sufficient showing that, absent the alleged antitrust violations by appellees, its commercial area would have been selected as a site for shopping center development .... [T]he question whether the appellants would have benefited but for appellees' actions is entirely speculative." *Id.* at 1045.

In *Los Angeles Memorial Coliseum Commission v. National Football League*, 468 F.Supp. 164, the Coliseum Commission alleged that the National Football League regulation which required an affirmative vote of three-fourths of the league's members before a member team could transfer its franchise from one city to another threatened to deprive it of revenue that it would receive if another team were to transfer to its stadium. The court made a similar inquiry to that of the Ninth Circuit in *Rohnert Park*, stating that in order to show the requisite "significant threat" of injury under *Zenith Radio*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129, the plaintiff needed to allege a "reasonable likelihood" that an affirmative vote by club owners would actually bring a professional team to the Coliseum. The court stated: "If, for example, it is likely that the only team that wants to move to Los Angeles decides to play in [another stadium], then there is no *significant* threat of injury to the Coliseum resulting from [the challenged regulation]." *Id.* at 161 (emphasis in original).

The essential question in applying the proximate cause requirement of the standing test in this case is whether there is a "reasonable likelihood" that the preconditions to the alleged injury will occur, or in the alternative, whether the plaintiffs have shown a threatened injury that is likely to be redressed by injunctive relief. If, for example, it were likely that the plaintiffs would be offered professional contracts based on professional scouts' observations of their performance in practice sessions, in regular season or post-season all-star games or on game films, the plaintiffs would not meet the proximate cause requirement of the standing test. A similar result would obtain if the University of Arizona football team's regular season performance was not good enough to prompt one of the bowl game committees to issue an invitation to the team.[15] Assuming that the team's performance did warrant a bowl invitation and that it was selected to play in post-season competition, a less than outstanding performance in the post-season

---

15. Given the University of Arizona football team's current record of six wins, three losses and one tie, and the fact that it is not ranked among the top twenty teams in the nation, it is questionable whether it would be selected to play in a bowl game if the Court were to grant the plaintiffs' motion for a preliminary injunction. Rather than base its holding on a prediction which it is not qualified to make, however, the Court will assume for purposes of the standing inquiry that it is "reasonably likely" that the University of Arizona would be extended an invitation to a post-season bowl game.

game or simply a perceived lack of ability to play professional football could also cause the plaintiffs not to be offered a professional contract.

In sum, there are simply too many factors other than the NCAA sanctions and the alleged injury for this Court to find that a proximate relationship exists. *Compare Rohnert Park v. Harris,* 601 F.2d 1040 (9th Cir.1979), with *Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049 (C.D.Cal.1971) (but for regulation preventing basketball association from signing athletes until four years after the graduation of their high school class, plaintiff would have received contract to play professional basketball). Based on the affidavits and memoranda considered, the Court concludes that there is little more than a remote possibility that the plaintiffs' "value" in the professional football trade would be substantially different but for the sanctions, or would improve were this Court to grant the injunctive relief. *See City of Rohnert Park v. Harris,* 601 F.2d at 1045, *citing Warth v. Seldin,* 422 U.S. 490, 495, 95 S.Ct. 2197, 2203, 45 L.Ed.2d 343 (1975).

Although the Court is of the opinion that the plaintiffs' allegation of threatened injury to their ability to compete for professional contracts is too remote to meet the standing requirement of section 16 of the Clayton Act, its disposition of the plaintiffs' group boycott claim on the merits precludes the necessity to dismiss the claim for lack of standing. Assuming, *arguendo,* that the plaintiffs have demonstrated an injury cognizable in equity which is proximately related to the alleged antitrust violation, the Court will proceed to evaluate the justiciability and merits of the plaintiffs' claim.

b. *Justiciability*

■ Section 1 of the Sherman Act proscribes only a "restraint of trade or commerce among the several states." Although the NCAA does not claim that it is entitled to a wholesale exemption from the Sherman Act as a non-profit association, it does argue that the NCAA sanctions at issue here are not a restraint of "trade" or "commerce" and thus are not subject to the Sherman Act. The plaintiffs correctly point out, however, that under the Supreme Court's decision in *McLain v. Real Estate Board,* 444 U.S. 232, 242–43, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980), subject matter jurisdiction is established over an antitrust claim if the defendant's overall business activity—not merely the particular conduct in question—has a substantial effect on interstate commerce. *See Turf Paradise, Inc. v. Arizona Downs,* 670 F.2d 813, 818–19 (9th Cir.1982), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982); *Western Waste Service v. Universal Waste Control,* 616 F.2d 1094, 1097 (9th Cir.1980), *cert. denied,* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980).

■ The national scope of the NCAA's regulatory activity is sufficient to establish the requisite interstate involvement here. The NCAA schedules games and tournaments that call for the transportation of teams across state lines, and regulates recruiting that takes place on a nationwide basis. *See generally Hennessey v. NCAA,* 564 F.2d 1136, 1150 (5th Cir.1977). In addition, the NCAA controls bids involving hundreds of millions of dollars for the interstate television broadcasting of intercollegiate sports events. *See Board of Regents of the University of Oklahoma v. NCAA,* 546 F.Supp. 1276, 1291–92 (W.D.Okl.1982), *aff'd in part,* 707 F.2d 1147 (10th Cir.1983), *cert. granted,* — U.S. —, 104 S.Ct. 272, 78 L.Ed.2d 253 (1983).

c. *Group Boycott Claim*

The plaintiffs contend that the sanctions which exclude the University of Arizona's football team from post-season and televised competition constitute an agreement by an association of its competitors to prevent the University from reaching consumers; accordingly, plaintiffs contend, the sanctions are a *per se* illegal group boycott under section 1 of the Sherman Act. The defendant responds that a boycott by the members of an association is not illegal under the Sherman Act unless it is intend-

ed to stifle competition, and that the sanctions in this case are not unreasonable restraints under the rule of reason.

■ Section 1 of the Sherman Act does not prohibit all concerted actions or agreements, but only those which unreasonably restrain trade. *See Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). In situations involving concerted action, the pertinent inquiry is whether the refusal to deal is so anticompetitive in purpose or effect as to be an unreasonably restraint of trade. *See Neeld v. National Hockey League*, 594 F.2d 1297, 1298 (9th Cir.1979). Courts have recognized that certain agreements or practices, because of their pernicious effect on competition and "lack of any redeeming quality," are conclusively presumed to be unreasonable and thus *per se* illegal. *See Northern Pacific v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Group boycotts are often included in the *per se* category. *See, e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators Guild of America, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

■ The group boycott cases have typically involved a concerted attempt by a group of competitors at one level to protect itself from competition from non-group members who are attempting to compete at that same level. *See Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C.Cir. 1978). The *per se* rule is applicable when the exclusionary or coercive conduct is a direct affront to competition, or "naked restraint," rather than action that merely

has an incidental effect on competition. *See Neeld v. National Hockey League*, 594 F.2d at 1300.

■ In this case, the attributes of a *per se* illegal boycott simply do not exist. There is concerted activity only in the sense that the NCAA is a membership organization enforcing rules contained in its constitution and regulations. The regulations at issue here, as distinguished from the rules governing television contracts in *Board of Regents of Oklahoma v. NCAA*, 707 F.2d 1147 (10th Cir.1983), pertain solely to the NCAA's stated goal of preserving amateurism. There has been no showing by the plaintiffs that the NCAA, its member institutions, or the Infractions Committee had any purpose to insulate themselves from competition by imposing sanctions on the University of Arizona or any of the other universities currently on probation.[16] To the contrary, the purpose of the sanction is not only to preserve amateurism but to *enhance* fair competition among the association's member institutions. In addition, the imposition of sanctions pursuant to NCAA rules is simply not "an agreement with business competitors in the traditional sense," nor can it be said to be without "any redeeming virtue." *See Gunter Harz Sports v. United States Tennis Association*, 511 F.Supp. 1103, 1116 (D.Neb.1981), *aff'd*, 665 F.2d 222 (8th Cir.1981) (tennis association rule prohibiting use of certain tennis rackets was not subject to *per se* rule where it served to protect fair competition in sport and did not involve agreement between business competitors in traditional sense). Because neither section 7 of the NCAA Enforcement Procedure Program nor the sanctions imposed on the Universi-

---

**16.** In stating that the sanctions were imposed pursuant to an agreement by member universities that compete with the University of Arizona for television appearances and post-season bowl invitations, the plaintiffs imply that its fellow member universities would wish to exclude it in order to increase their chances of reaping such benefits. Thankfully, the plaintiffs do not level this absurd charge expressly; rather, they admit that they "cannot specify the NCAA motives in imposing the sanctions." See Plaintiffs' Reply Memorandum in support of Motion for Preliminary Injunction, at p. 17 n. 2. Accordingly, the Court will not address the initial suggestion except to point out that the entire Convention of the NCAA, presumably including the University of Arizona, adopted the regulation under which the sanctions were imposed, and that the actual decision to impose the sanctions was made by the six members of the Infractions Committee, not the entire membership.

ty of Arizona are "naked restraints" or "manifestly anticompetitive," the NCAA sanctions are not subject to the *per se* rule but are rather to be reviewed under the rule of reason. *See United States Trotting Association v. Chicago Downs Association, Inc.,* 665 F.2d 781, 789 (7th Cir. 1981) (*per se* rule inapplicable to trotting association's prohibition against members' participation in races on non-member tracks, where rule's purpose was not to exclude competition and there was no showing that groups of drivers used association as a means to eliminate other drivers from competition); *Neeld v. National Hockey League,* 594 F.2d 1297, 1299–1300 (9th Cir.1979) (bylaw of professional hockey league which precluded player with one eye from participating properly reviewed under rule of reason where rule had safety purpose and at most an incidental anticompetitive effect); *Bridge Corporation of America v. The American Contract Bridge League, Inc.,* 428 F.2d 1365, 1370 (9th Cir.1970), *cert. denied,* 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971) (refusal of bridge league to sanction local tournament if plaintiffs' computer was used, where motivated by desire to preserve integrity of scoring system, did not warrant application of *per se* rule); *Cooney v. American Horse Shows Association, Inc.,* 495 F.Supp. 424, 430 (S.D.N.Y.1980) (suspension of horse trainer under association drug rule creating rebuttable presumption of trainer responsibility for horse's condition could not be characterized as group boycott *per se* illegal, given rule's purpose to foster fair competition); *Jones v. NCAA,* 392 F.Supp. 295, 304 (D.Mass.1975) (*per se* rule not applicable to NCAA rule barring student who had previously received compensation for playing hockey from playing intercollegiate hockey, where NCAA's purpose was not to exclude plaintiff from market but to promote principles of amateurism).

In addition to the fact that the NCAA sanctions are not a traditional group boycott in the sense that they lack an anticompetitive purpose, there is an independent reason why they should be treated under the rule of reason. A clear trend has emerged in recent years under which courts have been extremely reluctant to subject the rules and regulations of sports organizations to the group boycott *per se* analysis. This trend is "[b]ased in part upon the realization that 'in some sporting enterprises a few rules are essential to survival.'" *Brenner v. World Boxing Council,* 675 F.2d 445, 454–55 (2d Cir. 1982), *quoting Hatley v. America Quarter Horse Association,* 552 F.2d 646, 652–53 (5th Cir.1977). The Supreme Court set the foundation for the treatment of sports association regulations under the rule of reason in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). In *Silver,* the Supreme Court recognized a narrow exception to the *per se* invalidity of group boycotts when a "justification derived from the policy of another statute or otherwise" mandates application of the rule of reason. *Id.* at 348–49, 83 S.Ct. at 1252. Courts have extended the reasoning of *Silver* to situations in which there is a need for self-regulation inherent in an industry, and professional and amateur sports organizations have been included in this exception.

Sports organizations have not been given unlimited discretion in adopting rules and regulations. They have been subjected to treatment under the *per se* rule when the purpose of a regulation is to eliminate business competition, *see, e.g., M & H Tire Company, Inc. v. Hoosier Racing Tire Corp.,* 560 F.Supp. 591, 604 (D.Mass.1983); *Blalock v. Ladies Professional Golf Association,* 359 F.Supp. 1260, 1264–68 (N.D. Ga.1973), or when the regulation does not satisfy the basic tenets of procedural fairness. *See, e.g., Linseman v. World Hockey Association,* 439 F.Supp. 1315, 1321 (D.Conn.1977); *Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049, 1064–65 (C.D.Cal.1971). In *Denver Rockets,* the court held that in order to come within the *Silver* exception to *per se* treatment for group boycotts, a regulation must meet a three-pronged test:

"(1) There is a legislative mandate 'or otherwise'

 . . . . .

(2) The collective action is intended to accomplish (a) an end consistent with the policy justifying self-regulation, (b) reasonably related to that goal, and (c) is no more extensive than necessary.

(3) The association provides procedural safeguards which assure that the restraint is not arbitrary and which furnishes a basis for judicial review.

*Id.*

The plaintiffs in this case cite the *Denver Rockets* case at length in arguing that the NCAA sanctions constitute a group boycott that is *per se* unlawful. In *Denver Rockets*, a National Basketball Association (NBA) regulation prohibited any member team from drafting a player until four years after his high school class had graduated. Under this rule, the plaintiff was barred from playing in the NBA even though he left college after two years and had already played professional basketball in a rival league for one year. The court struck down the rule on grounds that the rule provided no opportunity for a hearing and was overbroad, noting that the rule prohibited the signing of not only college players but also those athletes who either did not desire to attend college or lacked the mental and financial ability to do so. *See id.* at 1066.

The plaintiffs argue that the sanctions imposed in this case fail the "fair procedure" and "least restrictive means" aspects of the *Denver Rockets* test. This Court has previously examined and rejected the plaintiffs' contention that the NCAA could have employed less restrictive means under the circumstances of this case. Further, their argument that they should have been notified and permitted to appear in the NCAA proceeding is not supported by the case law. The *Silver* requirement that "some form of notice and, if timely requested, a hearing" be afforded, 373 U.S. at 361, 83 S.Ct. at 1259, was satisfied in this case by the notice and opportunity for hearing given to the member institution upon which the sanctions were imposed. Although both *Silver* and *Denver Rockets* held that notice and a hearing were to be afforded the non-member of the organization affected by the rule in question, such a procedure was not overly burdensome in those cases. *Silver* does not require, however, that an association provide for hearings to any party affected adversely by a regulatory action when such a procedure would be so burdensome administratively as to effectively preclude it from acting at all to promote the association's objectives. *See Gunter Harz Sports v. United States Tennis Association,* 511 F.Supp. 1103, 1122 (D.Neb.1981), *aff'd,* 665 F.2d 222 (8th Cir. 1981) (tennis association not required to provide individual notice and hearing to producer of type of tennis racket banned under regulation where it would be overly burdensome to afford a hearing to all such parties adversely affected). In *Hennessey v. NCAA,* 564 F.2d 1136 (5th Cir.1977), college athletic coaches who lost their jobs as a result of a NCAA bylaw limiting the number of coaches each school could retain challenged the regulation on both constitutional and antitrust grounds. Responding to the plaintiffs' procedural due process argument that they should have been allowed an opportunity to address the enacting body prior to its passage of the bylaw, the court stated: "[t]o avoid such an attack, a state would be required to notify and give the privilege of debate to all persons who might be so affected. A statement of the problem in this context is sufficient to indicate the lack of merit in the plaintiffs' position." *Id.* at 1146–47. The court went on to evaluate the bylaw under the rule of reason rather than the *per se* rule, even though the plaintiffs had not been afforded a hearing. As in *Hennessey* and *Gunter Harz,* providing notice and an opportunity for hearing to each individual who is adversely affected by the NCAA sanctions would be so burdensome that it would undermine the very authority of the NCAA to impose sanctions. As noted previously, providing notice and a hearing to

the plaintiffs under the circumstances in this case would be illogical as well as burdensome, because the conduct of the plaintiffs is not at issue.

 The sanctions imposed by the NCAA in this case are reasonably related to the legitimate goals of preserving amateurism and promoting fair competition in intercollegiate athletics. Moreover, they do not lack procedural safeguards. Accordingly, the sanctions meet the tripartite test enunciated in *Denver Rockets* and thus fall within the *Silver* exception providing for rule of reason analysis for group boycotts that have legitimate self-regulatory ends.

NCAA regulations designed to preserve amateurism and fair competition have previously been upheld as reasonable restraints under the rule of reason. *See, e.g., Hennessey v. NCAA,* 564 F.2d at 1153–54; *Jones v. NCAA,* 392 F.Supp. at 304; *College Athletic Placement Service, Inc. v. NCAA,* 1975–1 Trade Cases ¶ 60,117 (D.N. J.1974), *aff'd,* 506 F.2d 1050 (3d Cir.1974). In *Hennessey,* the court noted that the record was "devoid of any evidence" that adoption of the bylaw limiting the number of coaches at a given institution was intended to injure the plaintiff coaches individually or as a group. The court added that an awareness on the part of the members of the association enacting the bylaw that there would be some individuals adversely affected could in no way be equated with an anticompetitive intent. The court upheld the bylaw as a reasonable restraint, stating that the bylaw had a rational relationship to the objectives of the NCAA. The court noted that pressures on member universities to maintain ever-increasing staff size in order to remain competitive was threatening both the competitive and the amateur nature of intercollegiate sports, and found that the fundamental purpose of the bylaw was "to preserve and foster competition in intercollegiate athletics ... and to reorient the programs into their traditional role as amateur sports operating as part of the educational processes." *Id.* at 1153.

In *Jones v. NCAA,* 392 F.Supp. 295, a NCAA rule prohibiting a player who had previously been compensated for playing ice hockey from participating in intercollegiate hockey was similarly upheld as reasonably related to the legitimate goal of preserving amateurism and promoting fair competition. The *Jones* court noted that "the N.C.A.A. eligibility rules were not designed to coerce students into staying away from intercollegiate athletics, but to implement the N.C.A.A. basic principles of amateurism." *Id.* at 304.

 The sanctions at issue in this case, like the regulations upheld under the rule of reason in *Hennessey* and *Jones,* have been shown to lack an anticompetitive purpose and to be directly related to the NCAA objectives of preserving amateurism and promoting fair competition. Like the bylaw in *Hennessey,* the NCAA sanction program was designed to prevent intercollegiate athletic programs from being driven by the pressures to "remain competitive" into committing practices that "threaten both the competitive and the amateur nature of the programs ...." 564 F.2d at 1153. The fact that the sanctions might have an incidental anticompetitive effect on coaches or athletes does not in itself render them unreasonable restraints under the rule of reason.[17] *See Neeld v. National Hockey League,* 594 F.2d at 1300.

---

17. The plaintiffs argue that the rationale of *Hennessey* and *Jones* is no longer applicable in light of *National Society of Professional Engineers v. United States,* 435 U.S. 679, 696, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978) ("the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable"), and that the NCAA cannot justify actions which exclude a competition by assessing a "social" purpose such as promoting amateurism or "fair competition" under the rule of reason.

The plaintiffs' contention is belied by a number of cases decided subsequent to *Professional Engineers* which have upheld comparable self-regulatory actions of sports organizations under the rule of reason. *See, e.g., Brenner v. World Boxing Council,* 675 F.2d 445, 455–56 (2d Cir.1982) (boxing council's suspension of promoter for failing to honor agreements with council or obey its rules did not constitute group boycott that was either *per se* illegal or unreasonable

In sum, it is clear that the NCAA is now engaged in two distinct kinds of rulemaking activity. One type, exemplified by the rules in *Hennessey* and *Jones*, is rooted in the NCAA's concern for the protection of amateurism; the other type is increasingly accompanied by a discernible economic purpose. *See Board of Regents v. NCAA*, 546 F.Supp. 1276, 1288–89 (W.D.Okl.1982), *aff'd in part*, 707 F.2d 1147 (10th Cir.1983), *cert. granted*, —— U.S. ——, 104 S.Ct. 272, 77 L.Ed.2d —— (1983) (price fixing in television contracts held violative of antitrust laws). The NCAA sanctions at issue here are clearly of the former variety. Because the sanctions evince no anticompetitive purpose, are reasonably related to the association's central objectives, and are not overbroad, the NCAA's action does not constitute an unreasonable restraint under the Sherman Act.

### B. *Balance of Hardships*

In order to meet the Ninth Circuit test for preliminary injunctive relief, the plaintiffs must demonstrate *either:* (1) a combination of probable success on the merits and the possibility of irreparable injury; *or* (2) that serious questions are raised on the merits and the balance of hardships tip sharply in favor of the plaintiffs. *See Benda v. Grand Lodge of International Association of Machinists*, 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). This standard applies equally to plaintiffs' antitrust claims and constitutional claims alike. *See Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980). The plaintiffs argue that the balance of

hardships is heavily weighted on their side. They claim that in the absence of preliminary injunctive relief, they will be permanently deprived of the opportunity to play in a post-season bowl game. They point out further that a bowl game appearance is the ultimate prize for a college football player and is of great sentimental value. The Court recognizes that participation in a post-season bowl game is of great sentimental and prestige value, and that a lost opportunity to play in a bowl game could not be adequately compensated, monetarily or otherwise, after the fact. The Court's prior holding that such an opportunity is not a constitutionally protected property or liberty right is not inconsistent with its belief that, assuming the University of Arizona's record warrants a bowl game invitation, the loss of such an opportunity would constitute a hardship to the plaintiffs.

In contrast to the hardship that would be imposed on the plaintiffs if preliminary injunctive relief were not granted, it appears that the NCAA would suffer no lasting harm if a preliminary injunction were granted allowing the University of Arizona to entertain post-season bowl invitations pending outcome of this litigation on the merits. The NCAA's delay of over three years in imposing the sanctions and further postponement of the sanction prohibiting television appearances until the 1984 season are indicative of the relative lack of hardship on the defendant. Although the granting of a *permanent* injunction against the imposition of the sanctions would quite possibly undermine the NCAA's pursuit of its legitimate objectives and therefore cause potentially great hard-

restraint); *Gunter Harz Sports, Inc. v. United States Tennis Association*, 665 F.2d 222, 223 (8th Cir.1981) (tennis association regulation banning certain type of tennis racket from use in sanctioned tournaments upheld under rule of reason where purpose of regulation was to preserve "essential character" of sport); *Neeld v. National Hockey League*, 594 F.2d 1297, 1300 (9th Cir. 1979) (enforcement by league bylaw prohibiting one-eyed player from playing in league did not constitute unreasonable restraint given safety purpose and "*de minimis*" anticompetitive effect); *Cooney v. American Horse Shows Associa-*

*tion, Inc.*, 495 F.Supp. 424, 431 (D.Neb.1980) (suspension of horse trainer for violation of drug rule designed to foster fair competition and preserve integrity of sport held reasonable where procompetitive benefits of the rule were predominant). These cases demonstrate that actions by sports organizations in preserving the integrity of the sport and fair competition are reasonable restraints under the rule of reason, even if they operate to exclude some competitors and thus have an incidental anticompetitive effect.

ship, mere preliminary relief would not impose a hardship on the NCAA.

### C. *Conclusion*

■ Assuming that the balance of hardships tips decidedly in favor of the plaintiffs, they need not demonstrate a probability of success on the merits, but rather must show only that their claims raise "serious questions." *See Wilson v. Watt,* 703 F.2d 395, 399 (9th Cir.1983); *Benda,* 584 F.2d at 315. As an "irreducible minimum" the plaintiffs must demonstrate "a fair chance of success on the merits." *See Sports Form, Inc. v. United Press International, Inc.,* 686 F.2d 750, 753 (9th Cir. 1982); *Benda,* 584 F.2d at 315. If the plaintiffs are unable to meet this minimum standard and show no chance of success at all on the merits, preliminary injunctive relief is not appropriate, regardless of the balance of relative hardships involved. *See Sports Form,* 686 F.2d at 753.

After a thorough review of the plaintiffs' constitutional and antitrust claims, this Court finds that the plaintiffs have not demonstrated that any of their claims raise "serious questions" on the merits. The plaintiffs have clearly failed to demonstrate that they have a "fair chance" of success on the merits. Based on the evidence before it, the Court is persuaded that the plaintiffs have virtually no chance of success at all on the merits. Having failed to raise "serious questions" on the merits under the Ninth Circuit standard for preliminary relief, it is obvious that the plaintiffs' claims would also fail to meet the more rigorous requirement of "probable success on the merits" contained in the first prong of the Ninth Circuit test. Thus, the Court need not make a separate inquiry as to whether the plaintiffs have shown a combination of probable success on the merits and the possibility of irreparable injury under the first prong of the test. The plaintiffs' application for a preliminary injunction restraining the NCAA from continuing to impose sanctions on the University of Arizona is hereby DENIED as to each claim. The plaintiffs' request for an account of costs and expenses is also DENIED.

### III. MOTION FOR SUMMARY JUDGMENT

■ The defendant has moved for dismissal, or in the alternative summary judgment, on each of the plaintiffs' claims. On the antitrust claim, the Court finds that the evidence amply supports the defendant's contentions that the sanctions are neither illegal *per se* nor an unreasonable restraint of trade under section 1 of the Sherman Act. The Court also finds that the plaintiffs have failed to raise any triable issue of material fact in responding to the defendant's motion for summary judgment. Accordingly, the Court concludes that the defendant is entitled to summary judgment as a matter of law on the antitrust count.[18]

Although the Court is inclined to grant summary judgment as to the plaintiffs' constitutional claims as well, it will refrain from doing so at this time. The Court is mindful of the parties' initial representations that they had not had sufficient opportunity to develop the factual record and thus were opposed to a consolidation of the preliminary injunction hearing with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). Although the Court is somewhat skeptical that further

---

**18.** The plaintiffs argue that summary judgment is inappropriate when the rule of reason is applied because of the factual nature of the inquiry, and cite *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The Ninth Circuit has noted, however, that *Poller* "cautioned only that summary judgment 'be used sparingly' and not that such relief is inappropriate in all antitrust cases." *See Neeld v. National Hockey League,* 594 F.2d at 1300 (9th Cir.1979), *quoting Mutual Fund Investors v. Putnam Management Co.,* 553

F.2d 620, 624 (9th Cir.1977) (citation omitted). Even in the antitrust context, in which summary judgment is used sparingly, the party opposing the motion must raise at least one issue of fact that may affect the outcome of the litigation. *Id.; see Cooney v. American Horse Shows Association, Inc.,* 495 F.Supp. 424 (S.D.N.Y.1980) (granting summary judgment on plaintiff horse trainer's claim that his suspension pursuant to horse association's disciplinary regulations constituted group boycott).

discovery will alter the legal posture of this case, it wishes to give the parties to this young lawsuit a full opportunity to present all the relevant facts. Therefore, the defendant's motion for summary judgment will be DENIED on counts I, III and IV without prejudice to its being renewed at a later time based on further development of the factual record. An Order will be entered GRANTING the defendant's motion for summary judgment on count two and DENYING the same as to counts one, three, and four.

The foregoing shall constitute the Court's findings of fact and conclusions of law.